Emery and another vs. The State.

Emery and another, Plaintiffs in error, vs. The State, Defendant in error.

*December 22, 1898 — January 10, 1899.*

CRIMINAL LAW AND PRACTICE. (1–4) *Separate trials.* (5–8) *Jurors.* (8, 9) *Waiver of objections.* (10) *Attorney general assisting in prosecution.* (11–14) *Witnesses: Self-incrimination: Waiver of privilege: Cross-examination: Collateral matters.* (15–17) *"Reasonable doubt:" Instructions to jury.* (18, 19) *Testimony of party: Admissions: Weight: Instructions.* (20, 21) Alibi: *Burden of proof: Presumption of innocence: Instructions.*

1. Where several persons are properly triable together for a criminal offense, the granting or refusing of a separate trial as to any one of them rests in the sound discretion of the trial court, and the determination of an application therefor cannot be disturbed except for a plain abuse of such discretion.

2. Where the defense of one defendant in a criminal case is antagonistic to that of another, or there is a witness whose testimony is not admissible on a joint trial but can be made available for one defendant if tried separately, as in case of the wife of a co-defendant, it is proper to grant a severance; and if such defense be so clearly antagonistic, or the evidence of the witness so clearly necessary and material, that a joint trial will be clearly prejudicial to the defendant asking for the severance, a denial of it is the denial of a right, because a just and fair exercise of judicial discretion would grant it.

3. The defense as to each of two defendants was the same. One of them was a married man. His wife had testified on a former trial, whereby it appeared that her evidence was manifestly not material to her husband's co-defendant. *Held,* that the denial of a motion for separate trials was proper.

4. *Prima facie,* joint defendants in a criminal case are triable jointly, and justice and public convenience require that course. A contrary course is resorted to only when the circumstances are such that, in the opinion of the trial court, injustice will otherwise be liable to occur.

5. Sec. 2533c, Stats. 1898, provides for obtaining regular jurors for a term of court when the business of the term demands it in the opinion of the presiding judge, leaving the question of whether the number shall be kept up to the maximum to the discretion of such judge.

6. Sec. 2533d, Stats. 1898, provides for obtaining jurors for a particular case when the regular jurors shall have been exhausted without obtaining twelve unobjectionable jurors for the trial.

7. Special jurors for a particular case cannot be drawn under sec. 2533c, Stats. 1898, from the names furnished by the jury commissioners, after the exhaustion of the regular jurors, whether the maximum number of such regular jurors are present at the term or not. Such special jurors can only be obtained under sec. 2533d.

8. Going to trial without objection to the collected jury waives all irregularities in selecting them unless an objection be made thereafter before the verdict is received. It waives all objections previously made unless renewed in the manner indicated.

9. A party to a criminal case may bind himself by waiver very much the same as in a civil case.

10. Under the law of this state it is the duty of the attorney general to assist in the prosecution of a criminal case before the trial court when duly requested so to do by the governor.

11. A person may properly refuse to give self-incriminating testimony on any trial, unless he waive his privilege to refuse either expressly or by implication; and testifying in the same case, on a former trial, as to the incriminating matter, or in ignorance of his constitutional right to refuse to do so, does not waive the privilege.

12. Where it is clear that a witness stands in need of instruction as to his constitutional privilege to refuse to give self-incriminating evidence, it is proper for the presiding judge to give such instruction.

13. Testifying on a trial, but not in regard to self-incriminating matters, does not warrant interrogatories on cross-examination in respect to such matters.

14. The trial court may properly sustain a witness's refusal to answer a question regarding mere collateral matters by which it is sought to disgrace the witness and discredit him in that way.

15. A charge on the subject of reasonable doubt, as follows: "The reasonable doubt mentioned, beyond which guilt must be affirmatively proved in order to justify a verdict of guilty, means, as its name implies, a doubt resting in reason. It must arise out of the whole evidence fairly and rationally considered," approved, the jury being also instructed that the legal presumption is that the accused is innocent.

16. It is proper to instruct the jury that "beyond a reasonable doubt" does not mean beyond a mere doubt, or possibility of innocence; that if guilt be established by evidence beyond any doubt founded in reason and common sense as applied thereto, a conviction should follow though the jury yet may believe there is doubt on the ques-

Emery and another vs. The State.

tion, not rising however to the certainty of a reasonable doubt, or though they yet believe in the possibility of innocence.

17. "Guilty beyond a reasonable doubt arising out of or based on the evidence," and "guilty beyond a reasonable doubt arising out of or for want of evidence," mean the same thing, in that the presumption of innocence must be overcome and guilt be established by the evidence beyond a reasonable doubt.

18. It is proper to instruct a jury that, while an accused person may testify in his own behalf, the jury should consider his evidence with all the other evidence in the case, and have a right to, and should, consider such accused person's evidence in the light of his interest in the result of the trial, and everything tending to discredit or corroborate him, and then give such weight thereto as they think it entitled to receive.

19. It is proper to say to a jury that, in determining the weight to be given to "casual statements or admissions of a party made in casual conversations to disinterested persons, the jury should consider the liability of witnesses to misunderstand or forget just what was said, depending upon the surrounding circumstances," and it may properly be added that it is regarded as very weak evidence, or even that it is regarded as the weakest kind of evidence that can be produced.

20. When an *alibi* is relied upon as a defense, and the court is requested to charge, in substance, that 'the burden of proof is not on the defendant to establish the *alibi*; it is sufficient for the purposes of the defense and to require an acquittal if, from the whole evidence on both sides, including that for and against the *alibi*, a reasonable doubt exists in the mind of a juryman as to the defendant's guilt,' it may properly be refused if the jury are instructed as to the presumption of innocence being in favor of the accused, and that a verdict of not guilty should be rendered unless such presumption be overcome by evidence and guilt established thereby beyond a reasonable doubt.

21. It is not strictly accurate to say, "The presumption of innocence *prevails* throughout the trial." An instruction that the presumption of innocence *attends* the accused from the beginning to the end of the trial and must prevail unless overcome by evidence so as to establish guilt beyond a reasonable doubt, approved as more accurate.

[Syllabus by MARSHALL, J.]

ERROR to review judgments of the circuit court for Marathon county: CHAS. V. BARDEEN, Circuit Judge. *Affirmed.*

The plaintiffs in error, *Charles H. Emery* and *William Lord*, were convicted of the crime of murder in the first degree. The facts are stated in the opinion.

For the plaintiffs in error there was a brief signed by *Geo. L. Williams*, attorney for *Emery*, and *Neal Brown*, attorney for *Lord*, and oral argument by *Mr. Williams.* They contended, *inter alia*, that testimony of observations based on natural conditions in the same latitude. and longitude and within less than twelve miles of the place of the homicide was admissible for the purpose of showing that the homicide was committed much later than the time testified to by the Houston witnesses. *Clark v. State*, 40 S. W. Rep. 992; *S. C.* 45 id. 696; *Wilson v. State*, 36 id. 587; *Smith v. State*, 2 Ohio St. 511. If a witness understandingly discloses part of a material transaction in which he was criminally concerned without claiming his privilege, he may be compelled to go forward and state the whole of it. *Brown v. Brown*, 5 Mass. 320; *Foster v. Pierce*, 11 Cush. 437; *Comm. v. Price*, 10 Gray, 476; *Comm. v. Pratt*, 126 Mass. 463; *Este v. Wilshire*, 44 Ohio St. 636. If full and complete answers would criminate the witness, he must claim his privilege before answering at all, otherwise he waives his privilege and must answer fully. If he assumes to testify at all he must state the whole truth, even if in doing so he criminates himself. *People v. Carroll*, 3 Parker, Cr. 83; *Brown v. Brown*, 5 Mass. 320; *People v. Arnold*, 40 Mich. 710; *State v. K——*, 4 N. H. 562; 1 Greenl. Ev. § 451; Wharton, Crim. Ev. § 470; *Foster v. People*, 18 Mich. 266; *State v. Foster*, 23 N. H. 348; *People v. Freshour*, 55 Cal. 375; *Comm. v. Lannon*, 13 Allen, 562. The contingency of the witness Emma Houston being called upon to answer a criminal prosecution for incest or fornication was too remote and improbable to be suffered to obstruct the administration of justice. *State v. Thaden*, 43 Minn. 253. An accomplice who has been allowed to give evidence for the government by the express or implied promise of pardon, contracts to make a full statement, can keep nothing

back, and should be allowed no privilege of communications. *Alderman v. People*, 4 Mich. 414; *Lockett v. State*, 63 Ala. 5; *Foster v. People*, 18 Mich. 266; *Pitcher v. People*, 16 id. 142; *Marler v. State*, 68 Ala. 580; *Hamilton v. People*, 29 Mich. 173, 1 Am. Crim. Rep. 618; *People v. Arnold*, 40 Mich. 710; Wharton, Crim. Ev. § 444; *Comm. v. Price*, 10 Gray, 472; *State v. Van Winkle*, 80 Iowa, 15. The instruction in respect to the interest of defendants and of other witnesses in the result was erroneous. *Woods v. State*, 67 Miss. 575; *Buckley v. State*, 62 id. 705.

For the defendant in error there was a brief by the *Attorney General, Charles E. Whelan*, second assistant attorney general, and *B. R. Goggins*, of counsel, and the cause was argued orally by *Mr. Goggins* and *Mr. Whelan*. They argued, among other things, that the refusal to grant separate trials was not an abuse of discretion. *Ball v. U. S.* 163 U. S. 662; *State v. Desroche*, 47 La. Ann. 651; *Comm. v. Seeley*, 167 Mass. 163; *Comm. v. Bingham*, 158 id. 169; *Spies v. People*, 122 Ill. 1. The rejection of the experimental testimony was not error. The conditions as to light were not the same as at the time of the murder. *Ulrich v. People*, 39 Mich. 245; *State v. Smith*, 49 Conn. 376; *Polin v. State*, 14 Neb. 540. The matter upon which it was sought to examine Emma Houston and David Jacobs was collateral to the issue on trial, and the court was justified in sustaining the claim of privilege made by them. When the fact of danger once appears, considerable latitude should be allowed the witness in judging for himself the effect of any particular question. *Stevens v. State*, 50 Kan. 712; *People ex rel. Taylor v. Forbes*, 143 N. Y. 219; 3 Jones, Ev. § 889. The giving of testimony on a former trial is not a waiver of privilege on a succeeding trial. *Temple v. Comm.* 75 Va. 892; *Reg. v. Garbett*, 1 Den. C. C. 241; *People ex rel. Taylor v. Forbes*, 143 N. Y. 219; *State v. Van Winkle*, 80 Iowa, 15. The asking of incriminating or disgracing questions is a matter largely in the discretion of the court. Underhill, Ev.

519; *Comm. v. McDonald*, 110 Mass. 405; *People v. Carr*, 64 Mich. 702. An accomplice is obliged to make full disclosure of the facts of the transaction under investigation, and not of the facts and circumstances of an independent crime. *Pitcher v. People*, 16 Mich. 142; *Clifton v. Granger*, 86 Iowa, 573; *Lombard v. Mayberry*, 24 Neb. 674.

MARSHALL, J. On the 2d day of June, 1893, in the county of Wood, in this state, Peter Houston was murdered by a person on the outside of his house, by a shot fired through the closed window soon after the light was lighted in the evening. The next day a neighbor, plaintiff in error *Charles Emery*, who lived with plaintiff in error *William Lord* at the home of the latter, was arrested, charged with the crime, and was duly bound over for trial before the circuit court for Wood county. In March thereafter, David Jacobs, the father of Peter Houston's wife, while under arrest for the crime of rape upon his daughter, confessed commission of the offense of criminal homicide as to Peter Houston, and implicated plaintiffs in error as being also guilty parties, and *Emery* as the person who fired the fatal shot. Jacobs soon thereafter, on his plea of guilty duly entered in court, was convicted of the offense and sentenced accordingly to confinement in the state prison at Waupun for life. Soon after such conviction, *Lord* was arrested for the offense, and thereafter, at the October term of the circuit court for Wood county, the Honorable CHARLES M. WEBB presiding, he and *Emery* were jointly tried for such offense and convicted of the full charge of murder in the first degree. Such proceedings were thereafter duly taken that the judgments rendered on the convictions were reversed in this court for error, and the cause remanded to Wood county for a new trial. The opinion on the appeal is found in 92 Wis. 146. We should say in passing that an error appears in the published report of the case in that it states the trial was before the Honorable W. F. BAILEY,

who was judge of the Seventeenth circuit, whereas it was, as indicated, before the Honorable CHARLES M. WEBB, judge of the Seventh circuit. After the case was remanded for a new trial, it was sent for trial, on a change of venue duly granted, to Marathon county, where a trial took place at the November term of the court for 1896, the Honorable CHARLES V. BARDEEN, then circuit judge for the Sixteenth circuit and now one of the justices of this court, presiding. Before the second trial commenced a motion was made for each defendant for a separate trial. The grounds on the part of *Lord* were, principally, that the wife of his co-defendant, *Emery*, was a material witness for him, and that *Emery* had made certain statements damaging to him. On the part of *Emery*, it was that statements had been made by *Lord* prejudicial to him, and because much of the testimony as to *Lord* was incompetent as to him. The motions were denied on the state's attorney's stipulating in open court to waive all objections to Mrs. Emery's testifying on the trial as to *Lord*. The trial then proceeded, Mrs. Emery being sworn as a witness. The result of the trial was a disagreement of the jury. At the next November term of the circuit court the cause was again tried, motions for separate trials being made and overruled as before, on a stipulation being made, as on the previous occasion, that Mrs. Emery might be sworn and testify as a witness. The result of the trial was a verdict of guilty, as before indicated. The questions discussed in this opinion were, by proper objections and exceptions, preserved for review on writ of error.

The evidence given on the trial pointed to the plaintiffs in error as guilty participants with Jacobs in the commission of the crime. The latter testified to the commission of the crime in all its details, and that *Emery* fired the fatal shot. Facts and circumstances leading up to the commission of the crime, and evidentiary of guilt of both defendants, were established, many of them without controversy, and

others on sufficient evidence to warrant the jury in finding their existence, as follows:

There was a road leading from Grand Rapids southeast and south about eight miles to the home of David Jacobs, a point about three miles from the home of the plaintiffs in error, and the same from the home of Peter Houston. From the home of Jacobs the road ran south about two miles, where it forked, one road bearing a little southeast, called the "Plainfield Road," and passing the home of *Lord* and *Emery*, located on the west side thereof, in a little over a mile; and the other, called the "Houston Road," continuing directly south for some distance, and then southwest, passing the home of Peter Houston a little over a mile from the forks, located on the west side and reached by a bypath ten rods long leading from the road in a northeasterly direction through some low jack pine and scrub oak brush. Further on to the southwest, about one hundred rods from the home of Peter Houston, the road passed the home of William Houston, the father of Peter, located on the right-hand side and reached by a bypath about thirteen rods long branching off to the west southwest. There was no house or person residing on either of the lines of travel indicated between the Jacobs home and that of *Lord* and *Emery*, or between the latter and that of Peter Houston. The home of Peter Houston on the Houston road was about one half mile due west of the home of *Lord* and *Emery* on the Plainfield road. It was feasible to drive nearly straight across through the small brush and among the trees, and there was a cross road connecting the two main roads a short distance south of the home of Peter and of *Lord* and *Emery*, by which there was a good passage for teams from one place to the other by traveling a distance of about two thirds of a mile. The distance from Grand Rapids to the two homes last mentioned was about the same, eleven miles.

*Lord* and *Emery* had resided where indicated for many

years. The former was a man a little over sixty years of age, and the latter about forty years of age, having a wife and two boys, one eight and the other ten years of age. David Jacobs moved into the country with his daughter Emma, a young woman about sixteen years of age, and a son James. The mother died when Emma was about thirteen years of age. Soon after coming to the state they moved onto a place owned by *Emery*, a short distance east of the *Lord* place. While living there, Emma and *Lord* became well acquainted and it resulted in their becoming engaged to be married. They were much in each other's company at the *Emery* place and the *Lord* place. In March thereafter, Jacobs moved to the point on the road to Grand Rapids before indicated. There Jacobs lived with his son James up to the time of the homicide. Soon after the removal, and contrary to the wishes of *Lord* and her father, Emma and Peter Houston were married. They resided thereafter, for a time, at the home of David Jacobs, when, on account of efforts made by Jacobs and *Lord* to part them, and suspicious and offensive conduct of both toward Emma, Peter moved to his own home located as before indicated. *Lord* and Jacobs continued their efforts to part Peter and his wife, *Lord* still desiring to marry Emma. His attentions became known to Peter, and resulted in his visiting *Lord* at the latter's home and threatening him with personal injury if he did not change his conduct. At the same time there was ill feeling between *Emery* and Peter, and between *Emery* and the Houston family generally. That was the situation at the time of the homicide. Bitter feelings of hostility existed on the part of *Lord*, *Emery*, and Jacobs, against Peter.

A few days before the homicide Peter's dog was fatally poisoned by some person unknown, after a second attempt to accomplish that result. On the day of the homicide *Lord* and *Emery* went to Grand Rapids, suggesting to *Emery's* wife upon leaving that they would not be home that night.

They returned as far as the Jacobs place about sundown. About dusk, and after supper, Peter and Emma left the home of Houston senior, where Peter had been at work during the day clearing land, for their own home.   Their home was a small, one-story, log house, with a lean-to on the south side, located among some small jack pine and scrub oak brush, with a few trees to the north a short distance away, and one tree a little way to the east southeast.   The house was lighted by two small windows, one on the north and one on the east end.   It had been a clear day, but there were signs of rain in the west.   On the arrival of Peter and his wife at their home, Emma lighted a lamp and spread a light lunch of bread and milk on the table, of which they partook, Peter sitting at the east end of the table near the east window and nearly in front of it.   The lunch over, Peter took his accordion from the shelf, moved back a little so that he was right opposite the window and exposed to full view from the outside, the curtain being up.   He played " Home, Sweet Home " once through, just finishing, when instantly upon a shot being fired from the outside he died.  Several buckshot pierced his head.   Death was so sudden that he sat thereafter as he last lived, upright in his chair with the accordion in his hands, till he was removed from that position by the family of Houston senior, who were soon on the ground, they having been summoned by Emma immediately after the tragedy.   Upon the' shot being fired, Emma opened the door leading into the lean-to at the south, and through the cracks in the boards she saw a man running around the house.   She immediately stepped back and closed the door through fear, then opened it and passed out and down the road toward the home of Houston senior, looking over her left shoulder as she. went toward the pine tree east southeast of the house, and saw two men, one of whom she recognized as plaintiff in error *Lord*.

*Lord* and *Emery* arrived at home about the time, or soon

after, the light was lighted there for the night.    They took a lantern, spent some little time at the barn taking care of their horses and doing the chores, then went into the house, and in a few moments thereafter, without partaking of supper, *Lord* took the Emery boys, who had been asleep on the couch, and retired for the night.    *Emery* retired soon after. An acquaintance lodged there that night and was present when *Lord* and *Emery* arrived home.    He testified on the trial.

The theory of the prosecution was that *Lord* and *Emery* and Jacobs left the home of the latter for the home of Peter Houston not far from sundown, all bent on the commission of the crime that was committed, the two former riding in a buggy drawn by a single horse, with a gun lying in the bottom of the buggy, and the latter on horseback; that they went straight down to Peter Houston's, and when in the vicinity of his house tied their horses near the side of the road; that they then approached the house to the vicinity of the pine tree east and southeast of the east window, from which point one of them, probably *Emery*, but all concerting together, fired the fatal shot; that Jacobs, as soon as practicable thereafter, reached his home by the regular route, and retired for the night; that the other two drove by the nearest route through the bushes and small timber to *Lord's*, or took the road around, either route requiring but a few moments to reach the *Lord* place; that soon after their arrival they retired for the night, as related before.    There were many circumstances other than those indicated, consistent with the guilt of the accused, and pointing that way. The theory of the defense was that Jacobs alone committed the offense, and that it was improbable or impossible that plaintiffs in error were present or guilty participants, because they arrived home before the offense was committed. The burden of the evidence on the part of plaintiffs in error was to establish the *alibi* sufficient to create a reasonable

doubt in the minds of the jury as to the location of the defendants at the time of the homicide.

We are asked to decide whether the determination of the motions for separate trials was error prejudicial to plaintiffs in error. Where persons are so circumstanced as to be properly triable together for a criminal offense, separate trials are not demandable as of right, except it be shown that a joint trial will so clearly be seriously prejudicial to one of the parties as to require a separate trial as to him to prevent injustice. The refusing or granting of such a motion is wholly within the discretion of the trial court, and its exercise, as in other cases of the exercise of discretionary power, cannot be successfully questioned except for a plain abuse of it. That was the rule at common law, and though it has been changed in many jurisdictions by statute, it has not been changed in this state. *Schoeffler v. State,* 3 Wis. 823; *Comm. v. Wallace,* 123 Mass. 401; *State v. Dixon,* 78 N. C. 558; *Spies v. People,* 122 Ill. 1; *State v. Kirkpatrick,* 74 Iowa, 505; *Comm. v. Miller,* 150 Mass. 69.

We are unable to agree with the position of counsel that a separate trial must be granted as a matter of right wherever that is necessary in order to give one defendant the benefit of the testimony of the wife of a codefendant. Such a circumstance alone does not create the right, but is to be taken into consideration by the trial judge in the exercise of his discretionary power. It may well be said, when the testimony of the wife of one defendant is material and reasonably necessary to the defense of a codefendant, that a severance should be granted on motion of the person seeking to obtain the benefit of such testimony, and that a denial of it is the denial of a right, because a fair exercise of judicial discretion would result in granting it; but in the absence of a clear showing that the evidence of the wife in the circumstances stated is necessary and material to the defense of a codefendant, the motion for a severance may properly

be denied. *Schoeffler v. State, supra,* cited by counsel for
plaintiffs in error, is not stronger in their favor than the
statement of the law made here, otherwise it would militate
against the rule, which we say is inflexible, that the grant-
ing or refusing a separate trial to a defendant jointly in-
dicted or informed against with another for a criminal of-
fense rests in the sound discretion of the trial court. *Prima
facie,* joint defendants are to be tried jointly for the pro-
motion of public convenience and public justice, and justice
to the defendants as well. The contrary course is to be re-
sorted to only to meet circumstances which would otherwise
tend to injustice. Clearly antagonistic defenses justly re-
quire separate trials; so the existence of a witness whose tes-
timony is clearly material and cannot be used without a
severance requires that a separate trial shall be granted.
Those grounds are the ones most familiar and most usually
resorted to for granting separate trials. So, when applica-
tion is made for separate trial on the ground that material
evidence cannot otherwise be used, the materiality of the
evidence is the turning point in determining the motion.

It follows that whether there was error in respect to re-
fusing the severance in this case depends upon whether the
evidence of Mrs. Emery was material and important to the
defendant *Lord.* The other grounds for the motion are not
seriously urged now, and could not be reasonably, because
the defenses of the two accused persons were not antagonistic.
It is conceded that they were together from first to last.
Everything in the case that bears on the question of where
*Emery* was at the time of the homicide bears on the ques-
tion of where *Lord* was. To determine whether Mrs. Em-
ery's testimony was important on that subject as to *Lord,*
reference is properly had to her evidence on the second trial,
the motion having been made on the third trial in part on
such evidence. If her testimony was material at all to *Lord,*
it was to support the *alibi,* to show that plaintiffs in error

arrived home before the commission of the homicide. We do not regard the particular time indicated by the clock at the home of Houston senior, or by any other timepiece, as controlling or very material. As said in support of the judgment on the argument, timepieces might easily have indicated different times in the day at the same instant, and an incorrect time. The time of day, as indicated by the actual disappearance of daylight, and the lighting of lights because of such disappearance, when the homicide occurred and when *Lord* and *Emery* arrived home, were the material things, and on that subject there was no substantial conflict between the testimony on the part of the state and that of Mrs. Emery. If anything, her testimony corroborated the state's theory. We are unable to see where her evidence would have added a feather's weight to support the *alibi*. Time intervened at the Houston home between the lighting of the light and the homicide, sufficient for Peter and his wife to partake of the light lunch of bread and milk and for Peter to play " Home, Sweet Home " once through. Time intervened between the lighting of the light at the Houston home and the arrival of *Lord* and *Emery* at their home, on the theory that they committed the offense, sufficient for Peter and his wife to eat their bread and milk, for Peter to play " Home, Sweet Home " once through, and for *Lord* and *Emery* to then regain their horses and travel about one half or two thirds of a mile. The time, approximately, for that would easily be determined by applying one's common sense to the situation as shown by the evidence. It was probably brief. Persons would move rapidly under such circumstances. It was not, necessarily, over fifteen or twenty minutes. There was a light at the *Lord* and *Emery* home for a sufficient length of time before their arrival for them to have traveled there from the Peter Houston home after the homicide, according to Mrs. Emery's testimony.

The difference between the location, condition, and char-

acter of the two houses, and the circumstances characterizing the movements of the occupants, were such that the probabilities are all in favor of the light having been lighted at the Houston home considerably earlier than at the *Lord* home. Peter and his wife entered the small, low, poorly-lighted room after walking for some distance in the open air in a northeasterly direction. That there was a delusive appearance of darkness in the log cabin under those circumstances is natural and probable, causing the lighting of the light sooner than it would have occurred if they had been in the house continuously from the going down of the sun. Mrs. Emery was about her house and her guest was sitting on the porch on the westerly side of the house reading. As night came on, her eyes, naturally, were accommodated to the disappearance of daylight so that she had no need of a light as she went about her work, till quite late. Her attention appears to have been first directed to the lighting of a light by the circumstance that her guest needed it in order to read inside the house. She lighted the light some few moments after that occurred to her, and it was five or ten minutes thereafter before *Lord* and *Emery* arrived home. Mrs. Emery testified to that, and that *Lord* and *Emery* took a lantern immediately upon arriving, and went to the barn, and returned in about twenty minutes; that as soon as *Lord* could get ready for bed, he took the two boys and retired; that he either took a light, or there was one upstairs that he could use; that it was dark. In addition, she gave some damaging testimony as to Jacobs and *Lord* conniving together shortly before the homicide to get Peter's wife, in the absence of Peter, to go to *Emery's*, where she would be under the control of Jacobs and *Lord*.

It is useless to go further into the subject. Sufficient has been said to demonstrate clearly that neither of the plaintiffs in error had anything to gain, but much to fear, from the evidence of Mrs. Emery. Instead of corroborating the

theory that they arrived home while it was yet daylight, or only a little bit dark, as *Emery* stated, her testimony would have corroborated the state's theory that the time of their arrival was consistent with the theory that they committed the homicide soon after the lighting of the light at Peter Houston's home, and then reached their own place as soon as practicable thereafter; and her testimony was otherwise damaging to *Lord* on a matter very material in the case,— that of the design of *Lord* and Jacobs to get Peter's wife away from him. It rather looks as if there was no ground whatever for granting a separate trial in aid of the plaintiff in error *Lord*, but that there were strong circumstances that might have persuaded the court to have granted a severance if the state had applied therefor in order to obtain the benefit of the evidence of Mrs. Emery against *Lord*.

After the regular jurors, there being but thirty-four in number, had been called, without finding twelve unobjectionable for the trial, the court ordered sixty additional jurors to be summoned from the county at large. That was objected to by counsel for plaintiffs in error on the ground that additional jurors can only be drawn from the names furnished by the jury commissioners; that there is no power to order jurors to be brought in from the county at large except in the event of inability to obtain a sufficient number for a trial by drawing from the names furnished by the commissioners. The objection was overruled, and jurors appeared pursuant to the court's order, some of whom were on the panel when it was finally completed, and participated in the trial. By the record as it stands, it appears that the selection of a jury was proceeded with without objection after the return by the sheriff of the additional jurors, till twelve unobjectionable jurors were obtained, and then that they were sworn and the trial proceeded without objection. No objection was made other than the one above indicated.

Sec. 2533c, Stats. 1898, provides that in case of a partial or entire absence of jurors of the regular panel at any time during the term, the court may order a sufficient number to be drawn to fill such panel, or a less number, as the public interests and the condition of the business may require, and that the jury commissioners shall see to it that the names furnished by them for the purposes of jury drawings, pursuant to law, shall not be less than 150 nor more than 500. Sec. 2533d provides that, whenever a sufficient number of jurors drawn according to sec. 2533c cannot be obtained for the trial of any case, the court may cause persons qualified to serve as jurors to be returned from the bystanders, or from the county at large, for the trial thereof, and make the proper and necessary orders therefor; but persons so summoned shall be paid only for service in such case.

Viewing these sections in the light of those they supplanted, and giving effect to the plain language used, it is not difficult to discern the true legislative intent. We may properly say that such intent is too plain to justify a resort to rules for judicial construction. Sec. 2533c refers solely to the method of obtaining what are called "jurors for the regular panel," and sec. 2533d, for obtaining jurors for a particular case on trial when the regular jurors shall have been exhausted. The former section, as indicated in the note thereto in the Statutes of 1898, is in place of sec. 2537 of the Revised Statutes of 1878, which provided for obtaining jurors for the term when necessary by summoning jurors from the body of the county. The latter section stands in place of sec. 2538 of the old statutes, which it will be seen is omitted entirely from the present revision. The language of the old section was as follows: "When by reason of challenge, or otherwise, a sufficient number of jurors, duly drawn and summoned, cannot be obtained for the trial of any case, civil or criminal, the court shall cause jurors, duly qualified, to be returned from the by-standers, or from the county at

large, to complete the panel for such trial, and the court may, in its discretion, order a special venire to issue for that purpose, or such jurors may be returned by the sheriff, or his deputy, the coroner, or any disinterested person appointed therefor by the court, without writ." It will be seen that the right to cause special jurors to be drawn for a particular case was not changed in any substantial particular by the substitution of sec. 2533d for the old section.

The contention that the regular panel must be kept full and exhausted before specials can be ordered under sec. 2533d is answered by the express language of sec. 2533c, to the effect that the trial judge may cause the regular panel of jurors to be kept full or not, as in his judgment the condition of the business requires. The section applies to regular jurors for the term as indicated, and nothing else. The power to summon special jurors is conferred by sec. 2533d the same as it was formerly conferred by sec. 2538, R. S. 1878. All that is said in *French v. State*, 98 Wis. 341, as to the latter section, and in regard to want of power of the court to summon special jurors by drawing from the list furnished by the supervisors, meets the position of counsel for plaintiffs in error that the drawing in this case should have been under sec. 2533c. There was no power to draw jurors under that section except when, in the judgment of the trial court, regular jurors were needed for the business of the term. In the *French Case* there was the full number of regular jurors when the impaneling of the jury was begun. Here, it was two short, but, as indicated, the statute expressly provides that the full number may or may not be kept up, in the discretion of the trial court. The contention of counsel for plaintiffs in error, that the power conferred by sec. 2533d cannot be exercised so long as the power conferred by sec. 2533c will enable the court to obtain a jury is clearly untenable, because, if that were true, the former section is not only unnecessary, but absurd, for it is made the duty of the

jury commissioners under the latter section to keep the list
of names for jury drawings at least up to 150. The perform-
ance of that duty, it must be presumed, the legislature had
in contemplation in the enactment of sec. 2533*d*, and in the
case of the performance of such duty power to obtain jurors
under sec. 2533*c* would never be exhausted.

There is a further answer to the assignment of error as to
irregularity in the impaneling of the jury, that no objection
was made to the jury when finally collected, or thereafter.
As suggested by the learned attorney general, the result an-
nounced in *Flynn v. State,* 97 Wis. 44, and there supported
by ample authority, applies, that one may waive objections
to irregularities in the summoning of a jury in a criminal
case, and does so by omitting to object at the proper time,
or expressing satisfaction to the collected jury, even if pre-
vious objection has been made. Silence when objection ought
to be made works a waiver as much as express assent. Said
the present chief justice, in *In re Roszcynialla,* 99 Wis. 534,
" Going to trial without objection waives prior irregulari-
ties." True, sec. 2881 says no irregularity in any writ of
*venire facias* or in the drawing, summoning, returning, or
impaneling of petit jurors shall be sufficient to set aside a
verdict, unless the party making the objection was injured
by the irregularity, or unless the objection was made before
the returning of the verdict; but the inference we are asked
to draw from that, that an objection made during the im-
paneling of a jury satisfies the statute, is not warranted in
good reason, and is contrary to the rule before stated and
often announced by this and other courts. The silence of
counsel for plaintiffs in error as to any objection to the jury
when they were collected, in effect withdrew all previous
objections. Such is the rule, as before indicated, especially
by modern decisions. The trend is in favor of the doctrine
that a party in a criminal case may waive irregularities, and

even rights, very much the same as in a civil case. *Judicia posteriora sunt in lege fortiora.*

The attorney general, on a written request made by the governor and presented to the court, and with the approval of the district attorney of Wood county and his assistant appointed by the court according to law, was permitted, against objection on the part of plaintiffs in error, to assist in the prosecution. That is assigned as error, citing *State v. Russell*, 83 Wis. 330, and *Biemel v. State*, 71 Wis. 444. The effect of those decisions is only that criminal prosecutions must be conducted at the expense of the public by officers or persons appointed by law for that purpose, and not by attorneys privately employed and privately paid, or publicly employed at private expense. They are in harmony with the conduct of the attorney general in this case. He was a constitutional officer, representing in the highest degree public justice from the standpoint of the prosecution. Sec. 1, art. VI, of the constitution, provides for the election of an attorney general, and sec. 3 of the same article says that his duties shall be those prescribed by law. By sec. 163, R. S. 1878, it is said as to the duties of the office as follows: "It shall be the duty of the attorney general, . . . whenever requested by the governor . . . to appear for the state and prosecute or defend in any court, or before any officer, any cause or matter, civil or criminal, in which the state or the people thereof may be in any wise interested." So, that the attorney general rightly appeared and assisted in the prosecution of this case does not admit of question. It was not within his discretion to comply or refuse to comply with the governor's request, or within the discretion of the circuit court to permit or refuse to permit him to participate in the trial. An occasion existed, in the judgment of the chief executive, calling for action on his part under the section referred to, and he decided wisely. Four years

had expired since the commission of one of the most das-
tardly offenses known in the history of the state, during
most of which time the supposed guilty parties had been in
custody, yet the law had not been vindicated, notwithstand-
ing two trials had taken place before two able judges, and
the prosecution had been conducted, and the defense as well,
by able attorneys, at great public expense.  It was of the
highest importance that the prosecution should be brought
to a speedy termination and the accused persons validly con-
victed if guilty, and acquitted if not guilty.  There is no
reason to pursue this subject further.  In the interest of a
certain and vigorous administration of the law in such im-
portant state cases, we deem it proper not only to say that
no error was committed by the act complained of, but to
commend the action of the governor and attorney general
and to say that what was done reflects credit upon their
administration.

For the purpose of showing that the homicide was com-
mitted much later than 8 o'clock, the time fixed by some of
the state's witnesses by reference to timepieces at the home
of Houston senior, and to support the theory that it was
committed after *Lord* and *Emery* arrived home, evidence
was offered as to the result of experiments made at a differ-
ent time in the year in the city of Grand Rapids about four
years after the homicide, when the instant of sunset was the
same as at the time of the offense, regarding the time of
the disappearance of daylight.  The offer, on objection by
the state, was rejected.  Before ruling on the offer, the trial
court permitted a searching examination of the witness who
made the experiments, as to the conditions then and there
existing, showing, in the judgment of the court, that they
were materially different from those which characterized
the time and place of the homicide.  No necessity exists for
going at length into details, showing that such judgment
was warranted by the evidence.  The learned trial court,

Emery and another vs. The State.

with the whole subject clearly before him, decided as a matter of law that the evidence was competent, subject to a prima facie case being made that the conditions on the two occasions were sufficiently similar to enable the jury to intelligently draw inferences from the result of the experiments as regards the evidentiary fact in issue, to which they related. On the question of fact the decision was adverse to the plaintiffs in error, and after a careful examination of the evidence we are unable to say that the decision was erroneous. It could not properly be disturbed unless clearly wrong. There was no question of law involved that was not decided rightly. The trouble was, the defense were not able to show satisfactorily to the court, prima facie, that the conditions existing on the two occasions were sufficiently similar to make the evidence admissible.

Questions were propounded to Emma Houston and to David Jacobs, calling for incriminating answers as to improper relations having existed between them before the marriage of Peter and Emma, and afterwards. Emma had answered such questions on a former trial, but said she did so not knowing the effect of her answers and of her right to refuse to answer. Being informed in that regard, she refused to reply to the interrogatories, and in that she was sustained by the court. David Jacobs likewise refused to answer such questions, the court, against objection, informing him of his rights. It was insisted then, and is now, that Emma waived her privilege by testifying on the former trial, and that such testimony precluded her from claiming such privilege on a subsequent trial, and that she, having testified in the case, was bound to make full disclosures; and that Jacobs was not privileged to refuse to answer for the reason, among other things, that he was serving a life sentence and had testified in the trial. The assignments of error are based on a misconception of the materiality of the evidence sought to be elicited. It was not material to the cause on trial. It

referred to an independent, collateral matter, hence was in no event admissible. It was suggested that it tended to show motive on the part of David Jacobs to commit the offense, but he was not on trial. He stood before the jury a confessed participant in the offense. The material question on the subject of motive was, What was that of *Emery* and *Lord* to commit the crime? The relations which had existed between Emma and her father had no bearing on that. As to the claim that the court improperly informed the witnesses of their rights, there was nothing improper in that. It is not necessary to decide here that the judge was or was not bound to explain to the witnesses their constitutional privilege, yet, when it was apparent that they stood in need of such instruction, it was perfectly proper for him to give it, and a just administration of the law required it. The right of a person to immunity from being compelled to bear witness against himself as to a criminal charge or matter, is a very old common-law right guaranteed by the constitution. It is certainly consistent with a just administration of the law for a trial judge to inform a witness of the safeguard the constitutional guaranty throws around him. It has often been so held, and authorities are by no means few in number that he is bound to do so under some circumstances. *Fisher v. Ronalds*, 12 C. B. 764; *Foster v. Pierce*, 11 Cush. 437; *Mayo v. Mayo*, 119 Mass. 292; 1 Lewis's Greenl. Ev. § 454.

As to the point urged that the witnesses had both testified in the case and therefore were bound to make full disclosures, the mere fact that they had so testified, but not, however, to criminal relations between themselves or anything pertaining to that, did not open the door for inquiry on cross-examination into that subject. The only effect of the inquiry would have been to disgrace them and discredit them in that way by bringing into the case mere collateral matters. The witnesses were entitled to protection against such in-

·quiries into their previous life and previous associations. The exception to that is where there has been a conviction of a criminal offense. R. S. 1878, sec. 4073; 1 Lewis's Greenl. Ev. § 456. The refusal to answer was properly sustained in any way it may be considered. .The evidence, as indicated, tended to incriminate the witnesses. They had a right to refuse to answer on that ground, even though the matter was material to the case, in the absence of a previous waiver of their privilege either expressly or by testifying on the subject. As indicated, the subject of the relations between Emma Houston and her father had not been testified to by either of them on the trial. The fact that Emma testified on the subject on a former trial, whether in ignorance of her constitutional right or otherwise, did not preclude her from asserting her privilege on this trial. True, there are authorities both ways on this subject, but this court is free, so far as being bound by any previous decision, to adopt its own view of the intent of the constitution. It was designed to preserve a valuable common-law right as it had theretofore existed, which was well defined and extended to immunity from giving self-incriminating evidence on a trial unless the privilege of such immunity were waived by the witness. The fact that a witness made previous self-incriminating statements in court on some other trial, or out of court, made no difference, the immunity was complete unless waived by the witness with knowledge of his rights. That right exists under our system by constitutional guaranty to the fullest extent, and is to be protected as rigidly and fairly as any other constitutional right, and not to be weakened or impaired by inventing new methods or ways of evading it.

The jury were instructed by way of explanation of the meaning of the term " beyond a reasonable doubt " as follows: (a) " The reasonable doubt mentioned, beyond which guilt must be affirmatively proved in order to justify a verdict of guilty, means, as its name implies, a doubt resting in

reason, and it must arise from the whole evidence fairly and rationally considered." (b) " When after a full and impartial consideration of the whole evidence the judgment of the jury is convinced to a moral certainty that the accused are guilty — that there is no reasonable explanation of the facts proved except upon the hypothesis that the accused committed the crime charged, then every reasonable doubt is removed and a verdict of guilty should follow." (c) "A mere fanciful or speculative doubt, such as a skeptical mind may suggest, does not amount to a reasonable doubt within the meaning of the law. A doubt such as this, one that ignores a reasonable construction of the whole evidence and proceeds upon mere speculation or suspicion, is unreasonable and would acquit one proven guilty as easily as one not so proven, and so does not justify a verdict of not guilty." That was excepted to as a whole, and also in the parts indicated, separately. In support of the exception it is urged that substantially the same instruction was condemned as erroneous in *Hoffman v. State*, 97 Wis. 571, and the following language by Mr. Justice NEWMAN, there used, is quoted and relied upon: " The vice of this instruction is that it seems to minimize the significance of a mere doubt by saying that, in order to be reasonable, the doubt must rise above the condition of mere doubt into a realm of certainty and conviction. It seems to exclude all doubts which have not passed the stage of mere doubt and become intelligent conviction that the case is not proved; whereas it has been understood that a mere doubt, reasonable and based upon the evidence or the want of it, that the case is proved, was sufficient to require the acquittal of the defendant."

The foregoing is an example of the unwarranted use by eminent counsel of language found in judicial opinions, and at the same time of the necessity of strict and clear accuracy of statement in presenting propositions decided, and the reasons in support of such propositions as well, to the end

Emery and another vs. The State.

that even the ordinary practitioner, much less such learned and able counsel as conducted this case, will not be liable to deceive themselves and assume false positions by reason of uncertain or obscure expressions. An examination of *Hoffman v. State,* as reported, will show that the language quoted above refers to a statement by the trial court as the law, not found, nor anything equivalent to it, in the instruction under consideration here. In the former case the learned circuit judge used the word " interpreted " where the word " considered " occurs here at the end of the first part of the instruction marked " (a) " and followed it with these words: "An intelligent opinion or conviction that the guilt of the defendant has not been satisfactorily proved." It was that, and that alone, which rendered the instruction in the *Hoffman Case* erroneous, and it was that, and that alone, to which all said by Mr. Justice NEWMAN relates. True, language was use in discussing the question, which, to the casual reader, may convey the idea that something less than a reasonable doubt of guilt justifies an acquittal, but the court did not intend to decide, or the late Mr. Justice NEWMAN to say, anything inconsistent with elementary principles. The term "mere doubt" was used several times, but certainly was not intended to convey the idea that such a doubt satisfies the call of "a reasonable doubt," or justifies an acquittal. The contrary is plainly expressed. "The vice of the instruction," said the late Justice NEWMAN, "is that it seems to minimize the significance of a mere doubt." That language counsel use and make significant by italicizing it, and add, "and it requires that it shall be based on evidence." -It ceases to have any significance in support of counsel's theory when read in connection with the language which follows, i. e., "by saying that, *in order to be reasonable,* the doubt must rise above the condition of mere doubt into a realm of certainty and conviction." Again, counsel quotes from the opinion as follows: "It seems to exclude

Emery and another vs. The State.

all doubts which have not passed the stage of mere doubt and become an intelligent conviction that the case is not proved;" but to that is added the explanatory clause: "*Whereas it has been understood that a mere doubt, reasonable and based upon the evidence or the want of it, that the case is proved, was sufficient to require the acquittal of the defendant.*" Mere doubt, reasonable doubt, and doubt rising to the certainty of intelligent conviction, were the subjects of discussion and illustration, and it was intended to say that, while certainty of guilt beyond a mere doubt, strictly so called, is not required to warrant a conviction, certainty beyond a reasonable doubt arising out of the evidence or the want of evidence, is necessary, and that if such doubt exist in the minds of the jury, they should acquit notwithstanding, though founded in reason and common sense as applied to the evidence, it be not sufficiently definite and certain in their minds to answer the call of intelligent opinion or conviction that the guilt of the defendant has not been satisfactorily proven.

It is not necessary to say whether the explanation of the rule of reasonable doubt given by the learned judge who presided at the trial is the best that can be made. It is sufficient to say that it is free from error, and, we may properly add, it is a clearer explanation than many that may be found referred to in reported cases as models. Individual judges and courts differ considerably on this subject, some deeming efforts to explain the meaning of the term under consideration, by multiplying words, as not only useless but dangerous. Thus, it was said in the *Hoffman Case*, " It needs be a skilful definer who shall make the meaning of the term more clear by the multiplication of words." Expressions found in legal opinions as to the advisability of making such explanations, or omitting them, are to be taken as the individual opinions, largely, of the judges. The mere question of whether it is helpful to a jury to make such an explanation is one of judicial policy to be decided by the presiding judge.

Much said about it in legal opinions, though proper as advisory, as indicated, is not binding on trial courts, and that may be applied to what is said here on the same subject. Most persons of wide experience as trial judges have been impressed very strongly, and on many occasions, that the due administration of justice requires a careful explanation to the jury of the meaning of the important legal term here discussed, to the end that they shall not act on the theory that mere impression or surmise that the accused may be innocent, or is possibly innocent, will justify an acquittal even though they be convinced of guilt by the evidence produced in court with such degree of certainty as to leave in their minds, as men of ordinary common sense and experience in life, no reasonable theory consistent with innocence. That such a situation is quite liable to be met with and justice defeated, the efficacy of law to protect society doubted, and its administration by the courts discredited, is quite plain to persons, generally, who have presided at criminal trials and met with such painful experiences.

In the judgment of the writer a careful explanation of the term "beyond a reasonable doubt" should be given to all juries in criminal cases, and especially in important trials. The jury should be so carefully instructed to minimize the danger of their mistaking "beyond a reasonable doubt" to mean beyond a mere doubt or mere possibility of innocence, or a doubt other than one founded on or arising out of, or for the want of, evidence produced in court; that it means what the language, broadly considered, naturally signifies, that is, beyond any doubt founded in reason and common sense as applied to the evidence. They should be made to understand that if they arrive at the degree of certainty indicated by the explanation given, a conviction should follow notwithstanding there may yet remain in their minds some mere doubt, or doubt not founded in reason or based on the case as made by the evidence (giving the defendant of

course the fullest and amplest benefit of the legal presumption of innocence), or they may yet be able to say honestly that to their minds the defendant is possibly not guilty. They should be made to understand, from beginning to end, the significance of the legal presumption mentioned, that it attends the accused all through the trial and should prevail at the end unless met and overcome by evidence establishing guilt with the degree of certainty indicated. In that they will see clearly that certainty of guilt beyond a reasonable doubt arising out of the evidence is required in view of the presumption of innocence; that is, that the evidence must overcome such presumption and establish guilt with the degree of certainty named.

The jury was further instructed: "If, after a careful and thorough review of the evidence, there arise in your mind a doubt for which a good reason arising from the evidence can be given, it is your duty to give the defendants the fullest and amplest benefit of that, and acquit them." That and other portions of the charge are criticised as leaving out of view the presumption of innocence, but the jury were told repeatedly in the instructions the significance of such presumption. That was kept prominently before them from the beginning to the end. In one of the closing paragraphs of the instructions they were told, "As I have said, the presumption of innocence attends the defendants through every stage of the trial, and it is your duty, if possible, to reconcile the evidence with that presumption." In connection with such instruction it was proper to say that the guilt of the defendants should be established beyond a reasonable doubt arising out of the evidence, conveying the idea that the presumption of innocence must be removed, leaving no reasonable doubt as to guilt. The expression is found often used, "beyond any reasonable doubt arising out of or based on the evidence;" also the expression, "beyond any doubt arising out of or for want of evidence." Both mean the

same thing, viewed in the light of the legal presumption of innocence; that guilt is not, but innocence is, presumed; and that the former must be established beyond a reasonable doubt by the evidence or the latter presumption must prevail. Cases there are, some of which have been brought to our attention, where the former expression has been severely criticised, and there are instances where it has been held erroneous, but the reasoning which reaches that result seems to be hypercritical and out of harmony with uniform holdings on the subject and the broad common-sense view which this court has taken as indicated in instructions that have been approved, notably in *Frank v. State*, 94 Wis. 218.

The jury were further instructed as follows: "Under the law of this state, the defendants are competent witnesses in their own behalf. They have given their testimony and it is before you to consider with the other evidence in the case. They are directly interested in the result of this trial. In determining the weight to be given to their testimony it is proper for you to take such interest into consideration. You are to give their testimony such weight as, under all circumstances, you think it entitled to. If other witnesses have any such interest, disclosed by the evidence, it is your duty to consider it in determining the degree of credit that should be given their testimony. You are cautioned, however, that interest in the result of the trial creates no presumption that such witnesses will swear falsely." Notwithstanding a case may be found (counsel for plaintiffs in error suggest one) which condemns that instruction as incorrect, it is in harmony with elementary principles and free from any reasonable criticism. It is proper to say to a jury that, notwithstanding a person accused of crime is permitted to testify in his own behalf, the jury have a right to consider his situation, his interest in the result of the trial, the temptation that exists under the circumstances to testify falsely, and everything appearing in the case, bearing on

his credibility, and to give to his evidence just such weight as they believe it entitled to receive, no more and no less; that it should be considered in connection with all other evidence in the case, and that the evidence of all witnesses should be subjected to the same test. That is substantially what the learned trial judge instructed the jury. The instruction was correct.

Error is assigned on the following instruction: "Statements or admissions of a party, satisfactorily proven, which bear upon or give character to the acts of a party, or throw light upon a pending controversy, are proper to be considered by the jury; but evidence of casual statements or admissions of a party, made in casual conversations to disinterested persons, should be considered by the jury, in determining the weight to be given to them, in view of the liability of witnesses to misunderstand or forget just what was said, depending upon all the surrounding circumstances." The criticism made is, that it holds up, by way of inference, evidence of casual conversations, when made to, or in the presence of, disinterested persons, as weaker than evidence of conversations made to, or in the presence of, interested persons. Counsel for plaintiffs in error print the instruction, omitting all punctuation marks after the word "but," thereby throwing the language into such confusion that the real meaning is not readily and at once discerned. With the language so unfairly presented,— we must call it that, though an explanation easily occurs consistent with entire absence of design, which it is quite agreeable to us to adopt,— it does not convey any idea, to minds unaffected by any purpose other than to impartially consider it and give such force and meaning to words, phrases, and sentences as would be ordinarily attributable thereto, inconsistent with the plainest of elementary principles. The circuit judge was speaking of statements and admissions satisfactorily established, bearing directly upon, or characterizing, a person's acts, and also admissions

Emery and another vs. The State.

given in casual conversations, made casually to disinterested persons, not having that character. It was said the former were proper for the consideration of the jury, and the latter to be weighed, having regard to the liability of witnesses to misunderstand or forget just what was said, the idea being that it was proper to consider statements satisfactorily established, characterizing the acts of a party and directly throwing light upon the issue, without necessarily taking into consideration the circumstances mentioned as liable to affect casual conversations incidentally made to disinterested persons. That appears perfectly plain when the language is examined as in the original charge. The mistake in presenting it as it occurs in the printed book is probably that of the printer, and it is not going too far to apprehend that the reason for the error assigned first suggested itself to the minds of counsel when they saw the instruction in print. We must assume they knew what the court had previously decided on the subject, and the elementary principle that mere casual admissions, made casually to disinterested persons, is the very weakest kind of testimony that can be produced. That hardly leaves any room for anything weaker; therefore, manifestly, the charge criticised is free from error. It is a literal copy of one considered by this court in *Haven v. Markstrum*, 67 Wis. 493, except that, instead of the language immediately following the words "disinterested persons," that is, "should be considered by the jury in determining the weight to be given to them," the following is used: "Are regarded by law as very weak testimony." This court not only approved ·of that instruction, saying it was strictly accurate as far as it went, but said "the trial court might have gone further and said that evidence of admissions made to third and disinterested persons is the weakest kind of evidence that can be produced." As before indicated, that is elementary. 1 Greenl. Ev. (Redf. 8th ed.), § 200; *Dreher v. Fitchburg*, 22 Wis. 675; *Husbrook v. Strawser*, 14 Wis. 403.

The court was specially requested to instruct the jury, in substance: (1) The burden of proof is not on the defendants to establish the *alibi*. It is sufficient for the purposes of the defense, and to require an acquittal, if, from the whole evidence on both sides, including that for and against the *alibi*, a reasonable doubt exists in the mind of any juryman as to the defendants' guilt; (2) if any of the jury entertain a reasonable doubt as to the guilt of the defendants of the crime charged, such juryman cannot, without great violence to his conscience and sense of right, agree upon a verdict of conviction; (3) and to give the following: "The burden of proof is upon the state to prove the guilt of the defendants, and they are presumed innocent unless the whole evidence in the case satisfies each one of the jurymen beyond a reasonable doubt that they are guilty. This presumption of innocence prevails throughout the trial, and it is the duty of the jury and each one of the jury, if possible, to reconcile the evidence with this presumption of innocence."

The first two instructions were properly refused because amply covered several times in the general charge, as before indicated. The jury were told that they should consider "only the evidence produced on the trial;" that "the burden of proof to establish guilt is on the state;" "it can only establish guilt by evidence given and received on the trial;" further, that not only at the commencement of the trial are the defendants presumed to be innocent of the charge in the information, but that "such presumption attends them through every stage of the trial;" and further, "duty requires the jury to reconcile the evidence with the presumption of innocence if possible." Those instructions also covered the third request mentioned, so far as it is good law. It is not strictly accurate and this court did not so decide in *Franklin v. State*, 92 Wis. 269, from which counsel seem to have got the idea. The error there was that the trial court refused, when requested, to instruct the jury on the subject

of the presumption of innocence being in favor of the defendant. It was decided that an instruction that the jury could not convict unless satisfied, from the whole evidence in the case, of guilt beyond a reasonable doubt, did not include information that the defendant was presumed to be innocent until proven guilty. The precise language of the charge there under consideration was not approved as a model or necessary. Any apt language conveying clearly to the jury the information that "the burden of proof is upon the state to prove the guilt of the defendant, and that he is presumed innocent unless the whole evidence in the case satisfies the jury beyond a reasonable doubt that he is guilty," satisfies the requirements of the law. The language in the third request to the effect that the presumption of innocence prevails through the trial is what strikes us as not being strictly accurate. This court did not approve of it in *Franklin v. State.* By way of argument it is there said: "Thus, it was held error to refuse an instruction to the effect that the presumption of innocence prevails throughout the trial, and that it is the duty of the jury, if possible, to reconcile the evidence with this presumption," citing *Farley v. State,* 127 Ind. 419. Substitute the word "attends" or the word "lasts" in place of the word "prevails" and the rule will then be stated with scrupulous accuracy, and as given to the jury in this case. Strictly speaking, the presumption of innocence *attends* the accused from the beginning to the end of the trial, and *prevails* unless overcome by evidence sufficiently strong and convincing to satisfy the jury of guilt beyond a reasonable doubt.

The last error assigned in the printed argument in behalf of plaintiffs in error is that the verdict is contrary to the law and the evidence. As to the law, all questions raised have been considered and decided adversely to plaintiffs in error. As to the facts, it is sufficient to say that we have examined the evidence with all the care that should be de-

voted to such an important case, and are unable to discover any reason for disturbing the judgments for want of evidence to support them.

We have now taken up in this opinion, one by one, the assignments of error discussed in the briefs of counsel, and in addition, should say, we have examined all questions raised by exceptions pointed out to us, though not referred to specially in the printed argument filed on behalf of the plaintiffs in error, and are unable to discover any reason why the judgments before us for review should be disturbed. We have given to the case that careful study which its importance requires and which was earnestly and properly urged upon us by counsel. It appears to have been tried with exceptional care and with marked ability both on the part of the learned judge who presided, the able counsel who represented the state, and those who represented the plaintiffs in error as well. The rights of the accused were defended and protected at every point. The result is fully justified by the record. Justice, though long delayed and attended with great public burdens, appears to have been finally triumphant. The law has been vindicated in our judgment.

*By the Court.*— The judgments are affirmed.

BARDEEN, J., took no part.