JAMBOR, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 15 — February 25, 1890.*

CRIMINAL LAW AND PRACTICE. *(1) Attempt to commit murder by means not constituting an assault. (2) Intent: Instructions to jury. (3) Evidence. (4) Previous arrests and discharge.*

1. The placing of a string attached to an explosive bomb across a person's private drive-way with the intent that such person by driving against or over the string should explode the bomb and be killed thereby, is an attempt to commit murder by means not constituting an assault, within the meaning of sec. 4374, R. S.

Jambor vs. The State.

2. On the trial of a person charged with such an attempt it was not error to charge the jury that a man is presumed to intend the natural, necessary, and even probable consequences of his acts deliberately done; and that if they found that the defendant planted the bomb, they should judge of the intent with which he planted it from all the evidence which they believed credible which tended to throw any light on the condition of the defendant's mind at and before the placing of the bomb.

3. The evidence in this case — partly stated in the opinion — is held to sustain a conviction of an attempt to commit murder by means not constituting an assault.

4. The fact that a person had been arrested three several times for the same offense, and had been discharged at the instance of the prosecuting attorney without any examination being had, is not a bar to a subsequent prosecution for such offense.

ERROR to the Circuit Court for *Racine* County.

The facts are sufficiently stated in the opinion.

*John T. Fish*, for the plaintiff in error, contended, *inter alia*, that the trial court erred in its instruction as to intent. In all cases of an attempt to kill by means not constituting an assault, no force is directed against the person whose death is intended, and therefore it is necessary to have some evidence, other than the acts of the defendant, to show the intent with which the act is done. In the case of an assault with intent to kill, where force is used against the person whose death is meditated, the act itself may prove the intent with which it is done. *Clifford v. State,* 58 Wis. 477, 490; *Cross v. State,* 55 id. 261. But in the case at bar Mr. Secor was not at the place of explosion, and it could not be said that there was the use of a deadly weapon against his person. It was error, therefor, for the court to charge as it did. *Simpson v. State,* 59 Ala. 1, 4; *State v. Stewart,* 29 Mo. 419. If the bomb was set by some person with intent that the same should be exploded and the force expended against the person of Mr. Secor, with intent to take his life, then the crime charged in the information would not have been committed. The offense would

be an assault with intent to murder.    2 Bish. Cr. Law, sec. 23; *People v. Pape*, 66 Cal. 366; *Simpson v. State*, 59 Ala. 1.

For the defendant in error there was a brief by the *Attorney General* and *L. K. Luse*, Assistant Attorney General, and the cause was argued orally by *Mr. Luse* and *H. A. Cooper*.

Cole, C. J.    It was charged in the information that the plaintiff in error, the defendant below, did, at the city of Racine, Wisconsin, on the 15th day of June, 1886, attempt to murder Martin M. Secor by means not constituting an assault.  The information charges that the means by which the crime was attempted to be committed was a metallic bomb containing loose nails and pieces of iron, and charged with a quantity of powerful explosives, to explode the same with deadly force and violence against the body of said M. M. Secor, and which bomb was so arranged with strings and appliances as to cause it to explode.  No question is made as to the sufficiency of the information, which is founded upon sec. 4374, R. S., and which reads: " Any person who shall attempt to commit the crime of murder by poisoning, drowning, or strangling another person, or by any means not constituting an assault with intent to murder, shall be punished," etc.    The defendant was convicted on the trial of the crime charged, and was sentenced to imprisonment in the state prison for ten years.    This writ of error is prosecuted to reverse the judgment.

The learned counsel for the defendant insists that the evidence in the record is entirely insufficient to sustain the conviction.   This is the principal point upon which the most reliance seems to be placed, as we understand counsel, though other errors are assigned.   It is manifest that the objection involves an examination of all the evidence given on the trial, in order to ascertain whether or not it is well taken.   We have given the testimony in the case as full and

careful an examination as our other duties will permit, and feel constrained to say that in our judgment it justifies the verdict. The testimony is quite voluminous, and it is impossible to even allude to all those portions of it which sustain the conclusion we have reached.

It may be observed, at the outset, that it is indisputable that on the evening of the 15th of June, 1886, at about 10:20 P. M., a bomb containing explosives and missiles was exploded, which bomb was placed on the north side of the drive-way leading from Milwaukee avenue into the premises where Mr. Secor resided, and was so arranged as to be exploded by means of a friction primer with a cord attached, which cord was made and kept taut by passing through the eye of a small iron rod, sharp at the other end, and stuck in the ground. The cord was about ten yards in length, and a small block or cork was fastened on the end, so as to prevent it from being drawn through the eye of the rod when pulled. This cord extended south across the drive-way, and the inference is irresistible, from the position of the bomb and the appliances for exploding it, that the party placing it there expected and intended it would be exploded by a person driving a horse and carriage against or across it, over the drive-way into the Secor grounds. It seems to us that this is the only possible or rational inference which can be drawn from the facts.

The evidence which tends to criminate the defendant, and connect him with the act of placing the bomb where it was exploded, is circumstantial. It is admitted that he was at the place of the explosion. Indeed, it appears that he exploded it himself, by walking against the string while crossing the street from the east to the west side, if his testimony is to be believed, not knowing that such a deadly instrument was there, and was wounded in several places by the missiles which it contained. The theory of the prosecution is that he accidentally exploded the bomb while attempting

to remove it, after Mr. Secor had driven home that evening. It appears the defendant lived in Milwaukee, was a machinist, and worked in the machine-shops of E. P. Allis & Co., of that city. It further appears, from the defendant's testimony, that he worked all day on the 15th of June at his usual employment, until 6 o'clock P. M., then went home, got his supper, and at 8 o'clock took the St. Paul train for Racine, at which place he arrived about 9:35. He had a partner by the name of Palica, and they were engaged in the manufacture of trunks at Racine. Palica had charge of the business, and the defendant contributed money from time to time as it was needed. He says, in effect, that he went to Racine that evening to take some money to his partner; that when he reached Racine he went to the office of Palica & Co.; that he opened the door with a key which he carried, went inside, lighted the lamp, opened the safe with a key he had, he knowing the combination, and put two $100 bills in the inside safe, then locked the safe, and sat down by the desk, and looked over photographs and catalogues which they had just gotten up. He staid there fifteen or twenty minutes, waiting for Palica to come. Palica not coming, he got up and left the office, locking the door, and started to go to Palica's house, which was five blocks distant north. When he came to Hamilton street, about two blocks from the office, he changed his mind about going to the house, thought he would let Palica know by mail the next day that he had placed $200 in the safe, and turned west on Hamilton street, to go to the Northwestern depot, to take the train over that road, which left at 11:10. When he reached Milwaukee avenue he turned and went south, on the east side of that street, until he came nearly opposite Secor's house, when he saw a man on the sidewalk ahead of him; and then he turned and went across the street. As he crossed the street, and came to the sidewalk, the explosion

occurred.    At first he thought he had been shot or that
some one was going to rob him; but, without making any
outcry, or giving any alarm, or calling for help, he passed
down Milwaukee avenue south to State street; thence east
on State street to Main street; thence to Palica's office, and
back to Main street bridge, leading north, where he met
Palica, and told him he had been shot in front of Secor's
residence while he was going to the depot.    He says he
remembered nothing after the explosion except being on Mil-
waukee avenue and on State street; did not remember seeing
or meeting any one until he met Palica on the bridge,—
which we suppose was a mile distant from where he was
wounded.

This, in brief, is the account which the defendant himself
gave of the business which took him to Racine that evening,
and of how he happened to be at the place when the bomb
was exploded.    It seems he went to take money to his part-
ner,— that was his business,— and he left the money at the
office, in the safe, without informing his partner that he
had been there, and without having any understanding with
him that he would be at Racine that evening or at any
other time.    It is needless to remark that this is not the
usual way in which such business is transacted, and what
adds to the strangeness of the story is the fact that Palica
was at Milwaukee the Sunday previous, or two days before,
having gone there especially to see the defendant and get
some money from him, but returning without it, though the
defendant met and was with him for an hour and a half in
the city, and had the money at home in his house.    The
explanation which he gives of the matter was before the
jury, whose duty it was to judge of the credibility of his
statements about this and other circumstances which had a
tendency to discredit him.    But the defendant swore posi-
tively that he had no knowledge of the bomb, and knew
nothing about who placed it where it was found.    His evi-

Jambor vs. The State.

dence is distinct, positive, and sufficient to establish his innocence, if he is to be believed. The jury had this testimony before them, as well as the testimony of other witnesses, who swore to matters which tended to criminate him.

It appears that Mr. Secor was that evening away from home, attending a business men's meeting at the city hall, and had returned home, with his horse and buggy, only a few minutes prior to the explosion. It was his habitual practice to drive to and from the business part of the city when he attended such meetings. He testified that the defendant, somewhere about half-past nine, opened the city hall door, "stuck his nose in the door," then made a motion with his finger, and Palica went out of the meeting. Secor is positive that the man he saw at the door was the defendant, whom he well knew. A criticism is made upon his testimony because he varied as to the time he saw this occurrence. He well might make different statements, honestly, as to the time; but as to the fact of seeing defendant he could not well be mistaken. His testimony is corroborated to some extent by the witness Olin, who was present at the meeting, and saw Palica there, and saw him go out of the room. He says, before Palica left the room he noticed the north doors, which were hung so as to be self-closing,— one of them was pushed open, and he saw the form of a man there distinctly, but did not know who it was.

A number of witnesses testified to their being on Milwaukee avenue and on State street just after the explosion, which they had heard. It was a clear, moonlight night; and several of them saw a man of medium size, dressed in dark clothes, wearing a soft hat or cap, and having a full beard, pass along south on Milwaukee avenue, and east on State street. Some of the witnesses passed very near this person, and noticed him. The policeman Matson, who was

on the northwest corner of State street and Milwaukee
avenue when the explosion occurred, says: " I, immediately
after the explosion, went up Milwaukee street, on the west
side, on the sidewalk.   I only met one person while I was
going· that block.   I met him just about in front of the
school-house.   I only passed and glanced at him.   I asked
him what was going on up there, and he said: 'Some
shooting, I guess.'   I noticed he was a small man, with a
beard and mustache, and limped."   Indeed, all the wit-
nesses who were on these streets agree in saying that but
one person passed south on Milwaukee avenue and east on
State street directly after the explosion.   And this is the
way it is admitted the defendant went immediately after
he was. wounded.   This testimony is very important.   It
tends to prove that the man who passed along these streets
wore a full beard.   If that man was the defendant he was
certainly disguised.   If the defendant was not this man,
how did he happen to go on these streets, at the same time,
the distance he did, on a bright moonlight night, without
being seen by any one?   It is perfectly unaccountable how
he could have done so.   And there was proof that the de-
fendant procured in Milwaukee, that day, a full beard,
which he says he intended to wear at a dramatic entertain-
ment which was to be given the following Sunday in Mil-
waukee to a party of Chicago turners, in which entertain-
ment he expected to take a part and represent the character
of a dude.   It was shown that it was not unusual for the
audience to call him out on such occasions, when he would
disguise himself to represent the character which he was to
take.   Now, this explanation was before the jury, with all
the other circumstances.   It further appears that the wit-
nesses Bowman and Schowalter, about ten  minutes before
10 o'clock, saw a man two blocks north of the Secor prem-
ises, in Freeman's court, off west from Milwaukee avenue,
who was evidently trying to avoid recognition or notice.

He walked into this court a few steps, and pulled his hat or cap over his face when he saw that these witnesses were observing him. But he was not identified as being the defendant.

The defendant's conduct after the explosion was surely most strange and unnatural. His counsel attempts to explain this on the assumption that he was so dazed and confused by the shock of the explosion, and the injuries he received, that he did not know what he was about, and that he wandered aimlessly up and down the streets, without knowing where he went or what he did. This might account for his conduct, but it does not explain that of Palica after he met the defendant on the bridge and was told he had been shot. The defendant was then bleeding considerably, and was ignorant of the extent and nature of his wounds. There was medical testimony which tended to prove that great confusion of mind may be produced by a severe nervous shock. Still, there was the testimony of other witnesses, who saw and talked with the defendant a few hours after the occurrence, who say that he seemed to be in possession of his mental faculties and gave a connected account of where he went and what he did.

But we shall not pursue the discussion of the evidence further. It was not our purpose to refer to all the items of testimony which tend to criminate or exculpate the defendant, but merely to allude to some portions of the evidence, in order to show that the verdict is not wholly unsupported by the evidence. The case really turns upon the credibility of witnesses and the probability or improbability of their statements. Did the defendant tell the truth about going to the office of Palica & Co., and depositing the money in the safe, on his arrival at Racine? Or did he go to the city hall, and call out Palica from the room, and have an interview with him? If so, he had an opportunity of knowing where Secor was. Did he put the

bomb where it was placed? Was he disguised when it exploded? And if so, why was he disguised, if his business in Racine that evening was honest and he exploded the bomb in the manner he describes? These questions, and all the suspicious circumstances, and the probability or improbability of the statements in regard to the defendant's guilt or innocence, were matters for the exclusive consideration of the jury. As was said by Mr. Justice TAYLOR in *Williams v. State*, 61 Wis. 281, 289: " The weight of the evidence, and its convincing effect, was for the jury, and not for the court. In criminal cases, the effect which the evidence shall have as tending to establish the guilt of the accused is for the jury. If they find it insufficient to establish guilt, there is no power in the court to set aside their verdict, though the trial judge might be convinced that the verdict was against not only the weight of evidence, but against all the evidence. On the other hand, if there be evidence which fairly tends to prove the guilt of the defendant, and the jury find the guilt, the court cannot properly set aside such verdict because he may entertain doubts as to its sufficiency to establish such guilt. Ordinarily, the decision of the trial judge upon the question of granting a new trial on the ground that the evidence is insufficient to support the verdict is held conclusive upon the court; and this rule is adhered to in a criminal case where the record contains evidence from which the guilt of the accused can be fairly deduced." These remarks are strikingly applicable to this case and the testimony we have referred to; for, as we have said, the guilt or innocence of the defendant rests upon circumstantial evidence, and the truth of the criminating facts rests entirely on the credibility of witnesses. We do not feel justified, under the circumstances, in disturbing the conviction, since, to our minds, there is evidence to sustain it.

The counsel says the testimony shows that the defendant

and Secor were intimate personal friends, and that no motive is shown why the defendant should wish to kill him, or set the bomb to effect that purpose. True, the case discloses no ill-will between the defendant and Secor. It does appear that Secor regarded Palica as his enemy, but the ground of this unfriendly feeling, if it existed and was mutual, is not disclosed. Whether it grew out of rivalry in the same branch of business, or was some old grudge or secret enmity, we do not know. If it had its origin in business rivalry, the defendant might naturally have participated in it, while pretending to be friendly. But upon this point the learned circuit judge directed the jury that if the evidence, after a careful examination, failed to show any motive on the part of the accused to commit the crime charged, then this circumstance should be considered, in connection with all other evidence in the case, in finding a verdict; that experience teaches that rational beings do not ordinarily commit great crimes unless actuated by some strong and persuasive motive; that where no motive appears strong and cogent enough to induce a man formerly peaceable to attempt to kill a friend in cold blood, the jury should scrutinize any and every circumstance from which it is sought to draw the inference of guilt with the greatest care; that if no motive had been shown, that was a fact entitled to great weight; but what might be considered by one person a sufficient motive might not have any weight on the mind of another; that proof of a motive was not absolutely essential in order to justify a verdict of guilty. The court also instructed as to the consideration which should be given to the evidence of previous peaceable character of the defendant, and seems to have given as much importance to that, as well as want of proof of motive, as the law would warrant.

The general charge of the court is criticised as being unfavorable to the defendant, but we think there is no just

ground for the criticism. The charge is clear, able, and correct, and in every way just to the defendant. It seems to cover fully the law applicable to the facts disclosed on the trial. The instructions asked on the part of the defendant, and refused, so far as they were applicable to the case, were in substance embraced in the general charge. Certain instructions were asked on the question of intent, which the court refused, and charged as to that point as follows: "As to the question of intent, the law is that a man is presumed to intend the natural, necessary, and even probable consequences of his acts deliberately done. If you find that the defendant planted the bomb, you will judge of the intent with which he planted it, from all the evidence which you believe credible which tends to throw any light on the condition of the defendant's mind at and before the placing of the bomb." We do not feel the force of the objection taken to this charge. It is very true the defendant is prosecuted for an attempt to murder M. M. Secor by means not constituting an assault with intent to murder. Actual assault or violence is not an ingredient of the crime. If physical force were used, it might amount to an assault with intent to murder, and be a different crime. But here the bomb was planted at Mr. Secor's drive-way, and a cord attached to the primer and made taut by means of the iron rod, and the whole so arranged that the bomb would be exploded when Mr. Secor should drive against the cord on the drive-way into his premises. It is unreasonable to presume that the party planting the bomb expected or intended to explode it by pulling the cord at the proper moment; for he would be quite as much exposed to its force and violence as Secor himself, against whose body it was especially aimed. It was doubtless intended the bomb should be exploded, without any act on the part of the guilty party, by the means prepared. It seems to us there is no room to entertain a doubt that it was expected the bomb

would be exploded by the action of the horse and buggy in passing over the cord; and, if it had been exploded in this way, it was absolutely certain to kill Mr. Secor in the buggy. As is argued on the part of the state, a distinction must be made between an actual assault committed by the direct force of the offender, and what is in the nature of a constructive assault, where the physical injury is produced by indirect means, without the presence or active force of the perpetrator. Suppose the defendant had placed some infernal machine under the bed of Mr. Secor, so arranged by clockwork that, after a number of hours, it would explode, with intent to kill him. Would not such an act, if, for any reason, the machine failed to explode as designed and expected, constitute the crime, within the statute? It seems to us it would. So we think the felonious intent might be inferred from the planting of the bomb arranged, as it was, to be exploded when Secor should drive over the cord, and from all the other facts of the case which tended to throw light upon the defendant's mind and purpose. The conclusion is irresistible, from the facts, that the intent was to explode the bomb in the way described and that the force should be expended against the body of Secor.

It is said that this tends to prove another crime, viz., an assault with intent to murder, which is not the offense charged in the information. But we cannot conceive of what offense comes under sec. 4374, R. S., unless the one charged does; for the statute has expressedly provided for an assault with intent to kill, and then provides for the offense of attempting to murder by poisoning, drowning, or strangling, or *by other means not constituting an assault with intent to murder*. So there must be a distinction between the two offenses. An assault implies some unlawful, physical force, partly or fully put in motion. It includes violence. But we are considering the attempt to commit murder by means not constituting an assault. If the facts

justify the inference that the bomb was to be exploded by some one pulling the cord, this would be the use of means constituting an assault. But here it is plain it was intended the explosion should be produced without any act or force exerted by the one planting the bomb, and we think this is the offense the above provision was intended to cover. Of course, the intent must have been, by the explosion of the bomb, to kill Secor, and not another person; and the court so charged. And the court, in effect, further charged that the jury might judge or find the intent with which it was planted from all the facts and circumstances in evidence. We can see no error in that charge. The planting of the bomb as described was not an equivocal act. It was a deadly contrivance, almost certain to kill a person against whom its force was expended. The corporal injury was to be done by indirect means, without the presence or active force of the offender. No actual use of violence was intended to be exerted; for it would be madness for the party planting the bomb to explode it by pulling the cord, standing within thirty feet of the place of the explosion. The court also instructed that three facts must be proven beyond a reasonable doubt to convict the defendant: (1) That he planted the bomb; (2) that he arranged the primer and cord so that he believed that the bomb would explode simply by the action of the horse and bug y passing over it; (3) that he intended that the bomb, by its explosion, should kill Secor,— also that the intent with which the bomb was planted might be inferred from all the evidence; in other words, from the character of the dangerous contrivance, and its appliances for explosion, and all other facts which tended to throw any light upon the condition of the defendant's mind at and before the placing of the bomb. As we have said, we think there was no error in this charge.

Another error is assigned upon the ruling of the court

on the plea in abatement. It appears that the defendant was arrested three several times for the same offense, was brought before a justice, and was discharged at the instance of the prosecuting attorney. These arrests were prior to the examination on which this prosecution is founded. No testimony was offered, nor was any examination held, on these prior arrests; and the question is, Do they constitute a bar to this prosecution? We are clearly of the opinion they do not. The presumption is that the defendant was discharged on the first arrests because the prosecuting attorney was not ready to produce the testimony on which he relied to prove the defendant's guilt. Sec. 4656, R. S., provides, in case any preliminary examination has been had, and the person complained of has been discharged for want of sufficient evidence to raise a probability of his guilt, and the district attorney shall afterwards discover admissible evidence sufficient, in his judgment, to convict the person discharged, he may, notwithstanding the discharge, cause another complaint to be made and a second examination had. This plainly authorizes the second examination on newly discovered evidence. But here, in fact, there has been but one examination; the defendant having been discharged on the first arrests without any testimony being produced or offered. On the admitted facts, they do not prevent or bar a further arrest and examination as to his guilt. The case is clearly distinguishable from *State ex rel. Dilworth v. Braun*, 31 Wis. 600.

This disposes of all the material questions in the case, and the judgment of the circuit court is affirmed.

*By the Court.*— Judgment affirmed.