VOGEL and others, Plaintiffs in error, vs. THE STATE, De-fendant in error.

*December 2, 1908—March 9, 1909.*

*Rape: Evidence: Sufficiency: Review in appellate court: Corrobora-tion: Jurors: Special venire prematurely issued: Harmless ir-regularity: Presence of accused, when necessary: Information: Conviction of persons aiding and abetting: Instructions to jury: Acts constituting one or several offenses: Election as to par-ticular act: Waiver: Res gestæ: Impeachment of witnesses: Con-viction of lesser offense: Fornication: Assault and battery: Ar-guments of counsel: Improper remarks: Immaterial error.*

1. Where the defense against a charge of rape is that there was fornication only, the courts hold to a strict rule of proof as to the essentials of the greater offense.
2. The refusal of the trial court to grant a new trial on the ground that the evidence is insufficient to support a conviction will not be disturbed by this court where the record contains evidence from which the guilt of the accused can fairly be deduced.
3. A conviction for rape may be had upon the uncorroborated tes-timony of the female assaulted.
4. The evidence in this case is *held* to warrant the conviction of rape.
5. Sec. 2533d, Stats. (1898), does not contemplate that a special venire shall be issued until the regular panel of jurors is actu-ally exhausted; but the issuance of such a venire in this case two days before the trial began, in anticipation of the fact that a sufficient number of qualified jurors could not be obtained from the regular panel, is *held* not to have been prejudicial to the defendants, and the error or irregularity should be disre-garded under secs. 2829, 4659.
6. The absence of the defendant when a special venire is ordered does not invalidate his conviction.
7. Under an information charging a party as principal he may be convicted on evidence showing that he was present and aided and abetted the principal felon in the commission of the crime, where the punishment for the actual commission of the offense and that for aiding and abetting in its commission are the same.
8. Thus, several persons may be convicted under an information charging them jointly with having committed rape, and it is not necessary that one of them should have been specifically charged with the crime and the others charged as aiders and abettors.

9. On the trial of several persons jointly charged with rape the jury were instructed that to hold any two or more of the defendants guilty of that offense the evidence must establish that "*some one* of them" performed an act of intercourse under such circumstances that it constituted rape and that such others as are held guilty "assisted him by the exercise of force, or threats, or *otherwise*, in committing such particular act, or *procured* him to commit such act." *Held*, that the use of the word "otherwise" was not improper, since a defendant might be guilty of aiding and abetting without using force or making a threat.

10. Nor did the use of the word "procured" render the instruction erroneous, it being evidently used and understood as synonymous with "aided" or "abetted," and there being no testimony to which this part of the instruction could apply if it were intended to cover absentees who counseled the commission of the offense.

11. Three series of acts of intercourse at two different places during a period of two hours—there being testimony tending to show that not all of the defendants were present when any one act of intercourse took place—are *held* not to constitute a single offense but several distinct offenses.

12. By the instruction above quoted (in paragraph 9) the jury were clearly told that they must acquit unless they were all agreed upon some particular act constituting the offense and also agreed as to the particular defendant who actually performed that act and as to those who assisted him therein.

13. The right of the defendants in this case to have the state elect upon what particular act it relied to secure a conviction was waived by failure to request that such election be made and by a request for instruction showing that they consented to the submission of the case to the jury in the way it was submitted.

14. A charge to the jury that, in order to render a person guilty as an aider and abettor, "he must himself in some way aid or assist the other in overpowering the female, or in effecting a particular act of intercourse under circumstances such as to make such act rape," was not—especially in view of the evidence in the case—misleading or prejudicial as failing to inform the jury that the person aiding or abetting must be present at the commission of the offense.

15. Statements made by the prosecutrix, a short time after the commission of the offense, to those who had rescued her from defendants and were taking her to a neighboring house, in reply to their questions as to what defendants had done to her and why she did not yell, are *held* to have been admissible as part of the *res gestæ*.

16. A witness for the state had written an account of the crime for a newspaper, but testified that it was not published as he wrote it. This testimony was not contradicted. Defendants offered in evidence the published article (which was claimed to give a very distorted account of the affair) for the purpose of showing bias on the part of the witness and of otherwise impeaching his testimony. *Held* that, in view of the uncontradicted testimony that the article was not published as written, it was properly excluded.

17. A person cannot be convicted of fornication under an information charging rape.

18. Refusal to instruct the jury that, under the information charging rape, defendants not guilty of that offense might be found guilty of assault and battery, was not error prejudicial to the defendants.

19. It is not error to refuse requested instructions which are adequately and fairly covered in the general charge or which relate to mere evidentiary matters.

20. A misstatement by the district attorney, in his argument to the jury, as to the time within which admitted acts of intercourse by defendants with the prosecutrix occurred, is *held* to have been harmless, in view of the trial court's direction to the jury to recall the testimony and not take counsel's statement on either side for what it was.

21. Language used by the district attorney in his argument to the jury, characterizing a witness as a "disreputable, dirty pup of a liar," is disapproved, but it was proper for him to comment upon the contradictory statements which the witness admitted having made, for the purpose of impeaching his credibility.

22. Statements by the district attorney, in his argument to the jury, that if the prosecutrix "was your or my girl, you wouldn't have waited to have a trial in court," and that "the people of the country are watching this case, and when they have another case like this they will have a lynching bee," are *held* improper and reprehensible, but not so prejudicial as to work a reversal of the conviction, where the trial court told the jury that such remarks were improper and admonished them to decide the case according to the evidence and to acquit the defendants, without regard to any other case or to the future, unless their guilt was established beyond a reasonable doubt.

23. Considerable latitude must be allowed counsel in arguing cases, and a judgment should not be reversed because of improper remarks unless this court is satisfied that the jury was not sufficiently instructed to disregard them or they appear to be so flagrant that they must have been prejudicial notwithstanding any admonition that may have been given by the trial court.

ERROR to review a judgment of the circuit court for Clark county: CHESTER A. FOWLER, Judge. *Affirmed.*

Writ of error to review conviction for rape and ten years' sentence to the state reformatory. The defendants were jointly arraigned upon an information containing one count, which, omitting the formal parts, alleges as follows:

"That on the 29th day of June, A. D. 1907, at said county, *Matthew Vogel, Joseph Christman, Peter Christman, Anthony J. Christman,* and *Henry Vogel* did, with force and arms, in and upon one Anna Engelbretson, of the age of fourteen years and more, to wit, of the age of eighteen years, violently and feloniously make an assault, and her, the said Anna Engelbretson, then and there, by force and against her will, violently and feloniously did ravish and carnally know, against the peace and dignity of the state of Wisconsin."

All of the parties involved attended a dance held at John Lempke's barn on the night of June 29th. About 11 o'clock the prosecutrix and another girl went to Lempke's house to get a drink of water, and on their return the prosecutrix was accosted by the defendant *Matthew Vogel.* The testimony of the prosecutrix is to the effect that said *Vogel* forcibly took her out of the yard and down the road to a clump of small trees on the roadside some twenty-four rods from the gate leading to the Lempke barn; that the other defendants followed them, and that all of the defendants had sexual intercourse with the prosecutrix forcibly and against her will at said place; that she was thereafter taken down the road some 500 feet further by the defendants, where they again committed the crime of rape upon her; that thereafter she was brought back to the place where the first alleged crime, or series of crimes, was committed, and the offense was repeated until the defendants were driven away by other parties appearing upon the scene.

The plaintiffs in error, who will hereafter, for the sake of brevity, be referred to as defendants, seek a reversal of the

judgment of conviction on the following grounds: (1) The
evidence is insufficient to support a conviction for the crime
of rape.   (2) The jury which tried the defendants was not
legally impaneled.   (3) The information was insufficient to
support a judgment for conviction.   (4) The court erred in
charging the jury.   (5) The court erred in refusing to charge
the jury as requested by defendants.   (6) The court erred in
receiving and rejecting evidence to the prejudice of the de-
fendants.   (7) The judgment should be reversed because of
prejudicial remarks made to the jury by the district attorney
in the argument of the case.

For the plaintiffs in error there was a brief by *L. M. Stur-
devant, R. J. MacBride, Homer C. Clark,* and *W. J. Rush,*
and oral argument by *Mr. Sturdevant, Mr. MacBride,* and
*Mr. Clark.*

For the defendant in error there was a brief by the *Attor-
ney General* and *F. T. Tucker* and *J. E. Messerschmidt,* as-
sistant attorneys general, and oral argument by *Mr. Tucker*
and *Mr. Messerschmidt.*

The following opinion was filed January 5, 1909:

BARNES, J.   We are urged with much earnestness to hold
that the evidence is insufficient to sustain a verdict of guilty,
and that therefore the judgment of conviction should be re-
versed and the defendants discharged.   Many considerations
are called to our attention to support this view, and some of
them are not wanting in force and persuasive power.   The
credibility of the testimony of the alleged victim, as well as
that of the principal witnesses tending to corroborate her
story, is vigorously assailed.   It is asserted that the condition
of the clothing of the girl, Anna Engelbretson, after the com-
mission of the alleged crime or crimes, and the condition of
her body, demonstrated that she was not the victim of a series
of criminal assaults.   Her failure to promptly acquaint her

parents, or other relatives, of the outrage, her alleged failure to make such outcries as might, and probably would, attract assistance, and the inherent improbability of at least a portion of her testimony, are said to furnish proof conclusive that the lesser offense of fornication only was committed. These, as well as other considerations, are forcefully pressed upon us with undoubted sincerity.

The abhorrent nature of the crime of rape so shocks every sensibility of manhood that a party even charged therewith has much to overcome where his defense is that the offense amounted to fornication only and not to the more heinous crime. As was said in *Brown v. State,* 127 Wis. 193, 199, 106 N. W. 536, "the proneness of woman, when she finds the fact of her disgrace discovered or likely of discovery, to minimize her fault by asserting *vis major,*" coupled with the impossibility of defense except by direct denial, has led the courts to a very strict rule of proof in such cases.

Five defendants were convicted on the trial of this case and are now under sentence for ten years each. The import as well as the importance of the case is such as to invite the closest scrutiny of the record, to the end that the court may satisfy itself therefrom, as far it can, whether the defendants were convicted of a crime they did not commit.

It is easy to perceive that the real issue in the case might readily have been lost sight of by the jury. The testimony of the defendants is less repulsive than that of their victim, because the element of force is denied; but, taking their testimony as they gave it, a person not learned in the refinements of the law might well feel inclined to say that a prison was the proper place in which to restrain their activities. The evidence given on the trial certainly makes a revolting if not an unique page in the annals of criminal law.

We fail to see where any detailed discussion of the evidence would be useful, except for the purpose of convincing counsel that it was carefully read and considered by the

court, and except, perhaps, to gratify the appetites of morbid minds for salacious reading matter. Neither reason is sufficient, and we must decline to unnecessarily soil the pages of our reports by narrating the evidence in detail.

"Ordinarily the decision of the trial judge upon the question of granting a new trial on the ground that the evidence is insufficient to support the verdict is held conclusive upon this court; and this rule is adhered to in a criminal case where the record contains evidence from which the guilt of the accused can be fairly deduced." *Williams v. State,* 61 Wis. 281, 289, 21 N. W. 56; *Jambor v. State,* 75 Wis. 664, 673, 44 N. W. 963.

Having in mind the foregoing rule of law as to the weight that should be given to the verdict of a jury in a criminal case, and also to the refusal of the trial court to set it aside as not supported by the evidence, it is the judgment of every member of the court, reached after mature deliberation, that the verdict should not be set aside as unsupported by the testimony.

The jury found that at the time of the commission of the offense Anna Engelbretson was not a common prostitute. Upon the evidence it was entirely justified in so doing. With one exception the only witnesses who testified to former misconduct on her part, or to evil reputation, were three of the defendants, and a portion at least of their evidence was almost too fantastic for belief. The evidence of the witness Edward Wensel is improbable, though perhaps not incredible, but was in direct conflict with statements deliberately made by him to the district attorney and sheriff. He was evidently a companion of *Mattie Vogel's,* having worked with him in the woods, and, according to his own story, accompanied him on at least one of his amatory peregrinations. The evidence referred to was important only as bearing upon the credibility of the witness Anna Engelbretson. It is the settled law of this state that a conviction for rape may be had upon the uncorroborated evidence of the female assaulted.

*Brown v. State,* 127 Wis. 193, 200, 106 N. W. 536; *Lanphere·v. State,* 114 Wis. 193, 202, 89 N. W. 128; *Osgood v. State,* 64 Wis. 472, 474, 25 N. W. 529. It is not seriously contended, if the testimony of such female in this case is taken to be true, that she does not testify to facts which establish the commission of the crime. But it is asserted that her evidence bears upon its face the stamp of unreliability, and that therefore, under the rule in *Hofer v. State,* 130 Wis. 576, 586, 110 N. W. 391; *O'Boyle v. State,* 100 Wis. 296, 300, 75 N. W. 989; and *Brown v. State, supra,* the principal facts must be corroborated by other testimony.

So much of the evidence of the prosecutrix as relates how she was taken by the defendant *Mattie Vogel* from near the Lempke house to where the first act of intercourse took place hardly seems credible. Considering the close proximity of a number of other persons, no good reason is apparent why she might not by her cries have attracted assistance if she apprehended that a criminal assault was about to be committed upon her. The improbability of the story related by the prosecutrix, in the foregoing and some other particulars, detracts from the weight that should otherwise be given to her evidence. But, whatever was the purpose of the prosecutrix in leaving the dance with *Vogel,* or whether she went voluntarily or forcibly, does not argue that the acts of intercourse testified to with the other defendants, or acts with *Vogel* after they arrived, were voluntary on her part, and there is certainly no inherent improbability in her assertion that they were accomplished by force and against her will. Neither is there any improbability in her statement to the effect that during the time the last acts of intercourse took place she was physically exhausted and in a semi-unconscious condition and incapable alike of resistance or consent.

But it seems to us that the evidence of the prosecutrix was corroborated. The defendants, except *Peter Christman,* admitted acts of intercourse. As to him, the proof of sexual

intercourse was almost conclusive. So the only material circumstance upon which corroboration was necessary was whether she offered that degree of resistance that was imperative in order to make the crime that of rape.

The house of William Catlin was about 150 feet from the point where the first acts of intercourse took place. Mrs. Catlin testified that she heard a girl cry, whom she took to be the prosecutrix, between 11:15 and 11:30 o'clock; that she got up and looked out the window and went back to bed again and was aroused again; that the dog growled and then she heard the girl scream; that she cried; that witness got up again and went to the window and heard the girl cry and beg for those boys to keep their hands off; that she said, "*Mat,* keep your hands off, and let me alone;" heard her say, "*Joe,* let me alone; *Pete,* keep your hands off. Let me alone. Let me go." Witness could not tell how many times she heard the prosecutrix scream, but no small number of times.

"She cried and screamed sometimes when they allowed her to. They told her to keep still and shut up her mouth and then she would keep still, and she would cry again and they told her to keep still. I heard this going on for at least an hour and a half."

The second series of acts of intercourse took place down the road about 500 feet from the first. In reference to what the witness heard after the parties left the first place she testified:

"I heard noise coming from the direction those people had gone down the road. I heard this girl scream, cry. I could not hear any words that she said. She cried quite steady when she was down there. She didn't stop but a minute or two at a time I don't think. I did not hear any one tell her to keep still, but I heard her cry, and she didn't cry right steady. I could not hear it steady. I saw what looked to be the same girl go up the road again. I saw this girl and three gentlemen come up the road. She tried to get away

from them. They had hold of her, one of them. She got away and started to run towards our big gate. I don't think it was the one that had hold of her first, but another one grabbed her and told her to stand still and she did. Then they went . . . to the first place they started from. I heard the cry again in just a few minutes. She cried quite a few times, too, then."

The witness then stated that she saw one of the men go up where the dance was being held and that four men returned in a short time to where the girl was; that she then aroused her husband and dressed and started for the road and met Arthur Sayles and his wife, who were going home in a buggy; that she told Mr. Sayles some brutes were abusing a girl and showed him the place. Mr. Sayles asked the men if there was a girl there and one of them said "No." His wife remarked that there was, because she could hear her sob. Mr. Sayles then got out of the buggy and the men scattered. There were six of them. When the witness first got up there, some of the men were on the ground, and it looked as if they were sitting down and had hold of her. Her face was covered with something. *Pete Christman* was having intercourse with the girl. They helped her into the buggy. Her skirts were all loosened and her hair was down and her waist was all black and dirty and was torn on the back. The girl did not say anything to witness; she cried all the time.

The testimony of Mrs. Catlin as to what took place after Mr. Sayles came along is substantially corroborated by the evidence of Arthur Sayles, only he saw nothing over the face of the prosecutrix. He testified that *Peter Christman* was apparently having intercourse with her and that there was a man on either side of her, but that he could not say whether they had hold of her or not. They were possibly six inches or a foot away from her. He testified that after the men ran away the prosecutrix attempted to get up but fell back. Minnie Sayles corroborated the evidence given by her husband, Arthur Sayles. Mrs. Sayles, with Mrs. Catlin, took

the prosecutrix in the buggy to the Lempke farm where the dance was held, and testified that she was crying so hard that she was scaring the horse, and that when she was taken out of the buggy at Lempke's she ran around and acted kind of wild.

The witness William Catlin testified that he heard a girl crying for help and that she wanted the fellows that had her to let her alone; that he heard the girl crying. He did not know how many times or how long he heard it, but it seemed possibly half an hour.

On the trial the defendant *Peter Christman* denied having intercourse with the prosecutrix. Her testimony in this regard, however, is corroborated by that of Mrs. Catlin and that of Mr. and Mrs. Sayles. It would appear that the corroborating evidence in this case was quite strong. If the girl cried and screamed as Mrs. Catlin testified she did, such action on her part certainly was not indicative of consent, but, on the contrary, tended directly to establish her claim that she resisted and that force was used to overcome such resistance.

It is argued that the established facts relating to the condition of the prosecutrix physically, and of her clothing, and to her failure to make an outcry when aid might be forthcoming, as well as her failure to notify her parents at once of the occurrence, render the corroborating evidence referred to unbelievable. It must be remembered that there were four or more able-bodied men taking part in the transaction, and that they should be able to overcome the struggles and the strength of a girl eighteen years of age, weighing about 125 pounds, without tearing off her clothing or clubbing or pounding her so that her body would show bruises.

The failure of the prosecutrix to relate the details of what occurred until the day following would ordinarily be a circumstance of much importance. It appeared, however, that her father had been advised, to some extent at least, by Arthur Sayles, of what had happened, even before his daugh-

ter arrived at the Lempke place in the buggy with Mrs. Sayles. When he went out to where she was in the buggy he testified that she was crying bitterly and would not answer him, so that he thought she had lost her mind. He further testified that he stated that if he knew who dragged his girl in the dirt he would shoot them if they came upon his lot, whereupon the defendant *Peter Christman* promptly hit him upon the jaw for his temerity in objecting to the treatment accorded his daughter. This occurrence took place in the presence of the daughter, and the inference would not be violent that she supposed that some one had informed her father of the outrage. That the matter was common talk at the dance before it broke up seems apparent from the evidence of the defendant *Henry Vogel,* who testified that he would not walk home from the dance with the prosecutrix because of such talk.

But the case is not wanting in circumstances that tend to corroborate the evidence introduced on the part of the state. The prosecutrix lived with her parents on a farm. She went to school until she was seventeen. Thereafter she spent part of her time at home and part of it working out, apparently no great distance from home. No evidence was offered to show that she had a reputation of being unchaste, and the only evidence tending to show lascivious conduct on her part has already been epitomized. The Lempke barn at which the dance was held was not half a mile from her father's home, and was attended by her brother, her father, her mother, and two sisters. The attendants at the dance were principally her neighbors and acquaintances whom she had known for years. She appears from her evidence to have been a girl of ordinary intelligence and one who had some experience with the world outside of that gained in her family circle. She left, or was taken from, the dancing place at about 11 o'clock. The time of her return is not definitely fixed, but was probably about 1 o'clock. She could

Vogel v. State, 138 Wis. 315.

hardly escape knowing that promiscuous acts of intercourse, with such as were present at the dance and as were invited to participate by her companions or captors, would become common knowledge and common talk within a short time in the community in which she and her father and mother and brothers and sisters resided. She could hardly escape knowing that her shame would soon be bruited from mouth to mouth and that she would be looked upon with scorn and contumely by her childhood associates, her neighbors, and acquaintances. That she should have consented to twenty-two acts of sexual intercourse, which she testified took place, or eight acts, as testified to by defendants, most of the acts taking place in the presence of at least four of the defendants, and all within the space of a couple of hours, is well-nigh unbelievable. In any event it might well be a severe strain upon the credulity of the jury to believe it. The story would be of doubtful veracity if told of a hardened wanton cast among strangers. We deem further discussion of the evidence unnecessary. The province of the court is to examine the record to ascertain whether there was sufficient testimony to warrant the finding of the jury. We entertain no doubt that there was.

The trial of the case commenced before Judge Fowler on January 6th. Judge O'Neill of the Clark county circuit, anticipating that a sufficient number of qualified jurors could not be obtained from the regular panel, in the absence of the defendants, and on January 4th, issued a special venire to the sheriff for twenty jurors, returnable on January 6th. All but one of the jurors named in the special venire were reported present when court convened on such date. Appropriate objection was made to the manner adopted for selecting extra jurors, and due exception was taken to the adverse ruling of the court thereon. The regular panel was first exhausted without securing the requisite number of jurors, and recourse was then had to those summoned on the special

venire.   Error is alleged because of the method pursued in
selecting the jury.   It certainly would have been entirely
proper for the court on January 4th to have ordered that the
jury list be replenished from the list of names furnished by
the jury commissioners under the provisions of sec. 2533c,
Stats. (1898).   In the absence of action by Judge O'NEILL
it would have been competent for Judge FOWLER, under sec.
2533d, to have directed the sheriff to secure additional jurors
from the county at large, or from the bystanders, to try this
particular case, when the regular panel was exhausted.
*Emery v. State,* 101 Wis. 627, 78 N. W. 145.   Sec. 2533d,
however, does not contemplate that a special venire shall be
issued until the regular panel is actually exhausted.   Con-
ceding that the special venire was prematurely issued, it was
no doubt issued to save time in the trial and expense to the
county and not from any improper motive.   Had Judge
FOWLER entirely disregarded the special venire and directed
the sheriff to summon talesmen from the bystanders or from
the body of the county, that officer might call upon the iden-
tical persons attending court in pursuance of the action of
Judge O'NEILL.   No substantial claim is made that the
sheriff did not perform his duty honestly, or that the de-
fendants have suffered any actual prejudice by reason of the
manner in which the jury was made up.   The summoning
of the talesmen in advance afforded defendants an oppor-
tunity to learn of any facts that might have a tendency to
disqualify or render the parties selected undesirable jurors,
which they would not have if action were delayed until the
regular panel was exhausted.   We do not think the irregu-
larity, if such it may be called, is of sufficient moment to
warrant a reversal of the judgment.   Neither do we think
the action taken by Judge O'NEILL was improper because
of the absence of the defendants.   The general panel of
jurors is always selected without the presence of the parties
they may be called upon to try for offenses.   No very good

reason is apparent why the same rule should not obtain in the case of a special venire. The presence of the defendants when a special venire is ordered does not appear to be necessary in order to secure a valid conviction. *Mabry v. State,* 50 Ark. 492, 8 S. W. 823; *State v. Allen,* 47 Conn. 121; *Cobb v. State,* 27 Ga. 648; *Pflueger v. State,* 46 Neb. 493, 64 N. W. 1094. It is true that in some of the cases cited the counsel for the defendants were present, but, where the law requires the presence of a defendant himself, it is very doubtful if the requirement can be supplied by the presence of his counsel. Sec. 4659, Stats. (1898), provides that no judgment in a criminal case shall be affected by reason of any defect or imperfection as to matters of form which shall not tend to the prejudice of the defendant. Sec. 2829, Stats. (1898), commands that this and all other courts shall, "in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." This statute applies to criminal as well as to civil actions. *Odette v. State,* 90 Wis. 258, 262, 62 N. W. 1054; *Cornell v. State,* 104 Wis. 527, 533, 80 N. W. 745. There is hardly a suggestion that the defendants were prejudiced in this case by the manner in which the jury was selected, and we conclude that there is no reversible error in this regard.

There was but one count in the information, and that charged the defendants jointly with having committed the crime of rape. The court charged the jury as follows:

"To hold any two or more of the defendants guilty of the offense here charged, the evidence must establish beyond a reasonable doubt that some one of them performed an act of intercourse with the prosecutrix, under the circumstances such as constituted the crime of rape, and that such others as are held guilty assisted him by the exercise of force, or threats, or *otherwise,* in committing such particular act, or *procured* him to commit such act."

It is urged that under the information filed the defendants could not lawfully be convicted of aiding and abetting, and that one of the defendants should have been specifically charged with the commission of the crime of rape, and the other defendants should have been charged as aiders and abettors, in order to justify the charge of the court or a verdict of guilty.    Sec. 4613, Stats. (1898), provides that:

"Every person who shall be aiding in the commission. of any offense which shall be a felony or who shall be accessory thereto before the fact by counseling, hiring or otherwise procuring such felony to be committed, shall be punished in the same manner as is, or shall be, prescribed for the punishment of the principal felon."

An examination of the authorities convinces us that the law is well settled that under an information charging a party as principal he may be convicted on evidence showing that he was present and aided and abetted the principal felon in the commission of the crime, where the punishment for the actual commission of the offense and that for aiding and abetting in its commission are the same.    Such an information informs the party that he has either actually perpetrated the offense set forth or has assisted some one else in doing so, and in either case he is equally guilty and has in fact committed the offense charged.    *Comm. v. Chapman,* 11 Cush. 422; *Comm. v. Fortune,* 105 Mass. 592; *People v. Chapman,* 62 Mich. 280, 28 N. W. 896; *People v. Flynn,* 96 Mich. 276, 55 N. W. 834; *State v. Harris,* 150 Mo. 56, 51 S. W. 481; *People v. Batterson,* 50 Hun, 44, 2 N. Y. Supp. 376; *Kessler v. Comm.* 12 Bush, 18; *Strang v. People,* 24 Mich. 1; *State v. Comstock,* 46 Iowa, 265; *State v. Jordan,* 110 N. C. 491, 14 S. E. 752; *Dennis v. State,* 5 Ark. 230; *Reg. v. Crisham,* Carr. & M. 187.    The text-book writers with substantial unanimity lay down the same rule.    1 Russ. Crimes, 230; 1 Ency. Pl. & Pr. 67; Archb. Crim. Prac. (Pom. 8th ed.) 1000 (*304); 22 Cyc. 374; 2 Bish. New Crim. Proc. (4th ed.) § 3.

The case of *Shannon v. People,* 5 Mich. 71, cited by counsel for plaintiff in error, must be considered overruled by the subsequent decisions of the Michigan court. The two New York cases cited (*People v. Dumar,* 106 N. Y. 502, 13 N. E. 325, and *People v. Flaherty,* 162 N. Y. 532, 57 N. E. 73) are not contrary to the general current of authority under consideration. In *People v. Dumar* the court held as a matter of fact that the act with which the defendant was charged did not amount to aiding and abetting in the commission of the offense. In *People v. Flaherty* the question we are considering was not before the court and was not decided. The case of *State v. Gifford,* 19 Wash. 464, 53 Pac. 709, is in point, but is contrary to the decided weight of authority.

Error is also predicated on the instruction quoted because the court informed the jury that it might convict such of the defendants as assisted in the commission of the rape by force or threats or "otherwise," or "procured" the commission of the act. Objection is taken to the use of the word "otherwise." Its use was not improper and was harmless in any event. The attitude of the defendants might well have been such, at times, as to have convinced the prosecutrix that they stood ready to commit such acts of violence as were necessary for the accomplishment of the purpose for which they were present, and thus overawed her by their mere presence and numbers. A defendant might well be guilty of aiding and abetting without using force or making a threat. We apprehend that, if he stood in the roadway for the purpose of giving warning of the approach of some person who might be likely to render assistance, he would be abetting in the commission of the crime.

Exception is also taken to the use of the word "procured" as used in the instruction. It is urged that if any of the defendants procured the offense to be committed he was an accessory before the fact and should have been informed against as such under sec. 4614, Stats. (1898). Conceding the con-

clusion to be correct, the premise is faulty. Those present assisting the one who personally commits the offense are aiders and abettors and are guilty as principals. Those who are absent, but who counseled the commission of the crime, are accessories before the fact. Bish. Stat. Crimes, § 139. To procure the commission of an offense does not necessarily imply absence. Procure means to obtain by any means; to bring about. Webst. Dict. It has no different significance in the law. 2 Bouv. Law Dict. 768; *Long v. State,* 23 Neb. 23, 45, 36 N. W. 310, 315. The court evidently used the word "procure" as synonymous with "aid" or "abet," and the jury could hardly have understood it otherwise. There was no evidence tending to show that any person was guilty as an accessory before the fact, as defined above, and no testimony to which this part of the instruction could apply, if it were intended to reach absentees who counseled the commission of the offense.

But the instruction is said to be faulty for another reason. There were three series of acts of intercourse at two different places between 11 o'clock at night and 1 o'clock in the morning. There is testimony, disputed however, tending to show that all of the defendants were not present when any one act of intercourse took place. It is asserted, and in this view a majority of the court concurs, that the entire transaction as shown by the testimony did not constitute a single offense, but that there was testimony tending to show several distinct offenses. The vice of the instruction is said to consist in the fact that the jury was authorized to return a verdict of guilty, though some of the jurors believed the crime to have been committed on one occasion and some on another, and all the jurors failed to agree on any one particular offense. This objection, if well taken, is fatal if the rule in *Boldt v. State,* 72 Wis. 7, 14, 38 N. W. 177, is adhered to, and we have no desire to overrule that case. We by no means agree with counsel's interpretation of the instruction.

It is fair to presume that the jury took the law as the court gave it, and followed the instructions of the judge. By this particular instruction the jury was advised that, in order to convict two or more of the defendants, it should find, beyond a reasonable doubt, (1) that some one of the defendants performed an act of intercourse under such circumstances that it constituted the crime of rape; and (2) that such others as are held guilty assisted him in the performance of such act by the exercise of force and threats and such like. Clearly by this language the jury was told that all jurors must be agreed upon some particular act, or otherwise it must acquit.

The defendants were probably entitled to have the state elect upon what particular act it relied to secure a conviction. *Cornell v. State,* 104 Wis. 527, 80 N. W. 745; *State v. Pruitt,* 202 Mo. 49, 100 S. W. 431, 10 Am. & Eng. Ann. Cas. 654. They not only failed to request that such an election be made, but asked for the following instruction:

"If the jury should find from the evidence in this case that no rape was committed, either at the first place the first time, or at the second place, yet should find that a rape was committed at the first place the last time, near the grove or clump of trees referred to, then in that case they can only convict such of the defendants as were actually present at said last-named place and at that time, and whom the jury, upon the whole evidence to a moral certainty and beyond a reasonable doubt, find to have had sexual intercourse with the prosecutrix at the last-mentioned place."

This instruction was refused, and it is argued that such refusal was error. The instruction was properly refused because it was not correct in its entirety as a proposition of law. If given, only those who had sexual intercourse with the prosecutrix could have been convicted. It excluded conviction for aiding and abetting. Excluding the erroneous portion of the charge requested, the remainder was substantially given in the general charge. The request, however, is important in that it shows that no election was requested, and

that defendants consented, as far as they might, to the submission of the case to the jury in the way it was submitted. This court has been liberal in holding that defendants in criminal actions may waive many things upon which they have the right to insist, if they elect so to do. *Cornell v. State, supra; Emery v. State,* 101 Wis. 627, 78 N. W. 145; *Miller v. State,* 25 Wis. 384; *Williams v. State,* 61 Wis. 281, 292, 21 N. W. 56. If the right to require an election existed it was waived.

Still another objection is made to the charge quoted. It is said that under it the jury might not be agreed as to who performed the act of intercourse and was therefore principal in the first degree, and who were guilty as principals in the second degree by reason of the aid given toward the accomplishment of the rape. Inasmuch as the offense in either case is the same, there are decisions which hold that it is not error to submit the case as it is claimed it was here submitted. *People v. Flynn,* 96 Mich. 276, 55 N. W. 834; *State v. Handy* (Del.) 66 Atl. 336. Under the information charging the defendants with having jointly committed the crime of rape the trial court was of the opinion that the defendants could only be convicted of one offense, in which all must participate who were found guilty. There is authority to support the view of the court. 1 Bish. New Crim. Law, § 802; *O'Connell v. Reg.* 11 Clark & Fin. 155. If erroneous, it was favorable to the defendants, so they have no cause for complaint. If the jury followed the direction of the court it must have agreed that some single act of intercourse was performed by some defendant under circumstances such as to make his crime that of rape, and it must have found that the other defendants aided him in the commission of that particular act. This method of procedure necessitated the jury's agreeing upon some act at which it believed all the defendants were present, and, it would seem, necessitated its agreement upon some one person as principal in the first degree.

Having agreed upon the particular act of intercourse which constituted the crime, there could be little room for conjecture upon the testimony as to who actually did the act and who assisted him.   So, when the court told the jury that it must agree that *some one* of the defendants performed an act of intercourse with the prosecutrix under circumstances which made the act rape, it does not follow that the jury was at liberty under the instruction to arrive at different conclusions as to the identity of such party.   The words "some one" as used in the charge are not equivalent to saying "either" or "any one," but rather mean a particular person, taking such words in the connection in which they occur.

In reference to what a person must do in order to be guilty of the crime of rape as an aider and abettor the court charged the jury as follows:

"In order to render himself so responsible he must himself in some way aid or assist the other in overpowering the female, or in effecting a particular act of intercourse under circumstances such as to make such act rape."

It is argued that this instruction is erroneous because the jury was not informed that the person aiding or abetting must be actively or constructively present at the commission of the offense.   It is true the word "present" was not used by the court, but it is difficult to see how an absentee could assist the principal felon in overpowering the female or in effecting the act of intercourse which constituted the crime. The language of the charge complained of, considering the evidence in the case, was neither misleading nor prejudicial to the defendants.

When the witness Arthur Sayles appeared upon the scene and the defendants scattered he had some conversation with the prosecutrix.   He testified on the trial, under objection, that he asked her if they had done anything to her which they ought not to have done, and that she replied, "My God, I don't know what they didn't do."   Mrs. William Catlin

testified to the same conversation, also under objection.  Mrs. Catlin was also permitted to testify under objection that while she was proceeding in the buggy from the place where the prosecutrix was found to the Lempke house she asked her why she did not yell, to which she replied, "I didn't dare." It is asserted that this testimony was hearsay and self-serving and should have been excluded.  Considering the condition in which the evidence showed the prosecutrix to be when found, and the short time that elapsed between her discovery by the witness and the making of the statement, and the surrounding conditions, the testimony was receivable as part of the *res gestæ.*  Were it otherwise, it is not of sufficient moment to warrant a reversal of the judgment.

An article was published in the Milwaukee Free Press giving what was claimed to be a very distorted account of the affair and one which it is claimed greatly exaggerated the facts to the prejudice of the defendants.  The witness Arthur Sayles testified that he wrote the matter up for the Milwaukee Free Press, but denied that the article was published as he wrote it.  The defendants sought to introduce in evidence a copy of the newspaper in question for the purpose of showing bias on the part of the witness and of otherwise impeaching his testimony.  The evidence was excluded by the court.  In view of the testimony given by the witness that the article was not written by him as published, and there being no testimony in the case to show that his evidence in this regard was not correct, the ruling of the court in excluding it was right.

Two other errors are assigned on the admission of evidence, but we regard them as being too trifling and inconsequential to merit special attention.

The court was asked to instruct the jury that if it should find the defendants, or any of them, not guilty of rape, it might find such defendants guilty of fornication if convinced of their guilt beyond a reasonable doubt.  The instruction was

refused. The ruling of the court in this regard was correct. *State v. Shear,* 51 Wis. 460, 8 N. W. 287.

The court was likewise requested to charge the jury that it might find such of the defendants as were not guilty of rape guilty of assault and battery, provided such offense was proven to its satisfaction and beyond a reasonable doubt. This request was likewise denied. It would have been entirely proper to have given this instruction, but the refusal so to do was not error. *Hempton v. State,* 111 Wis. 127, 86 N. W. 596; *Murphy v. State,* 108 Wis. 112, 83 N. W. 1112.

Instructions were requested with reference to the "presumption of innocence," "burden of proof," and "reasonable doubt." These subjects were adequately and fairly covered in the general charge.

Some other requests to charge were made and refused. The subjects embraced in such requests were either covered by the general charge or related to mere evidentiary matters, and were properly refused. They were not considered by counsel to be of sufficient moment to warrant discussion in their brief or at the bar.

The district attorney, in explaining why the witness William Catlin did not go out of his house to assist the prosecutrix, stated, "He did not have any gun in the house." An objection was made to this remark and it was withdrawn. The statement was not justified by any evidence in the case and was improper. The district attorney also stated, in substance, that the defendants testified that they had connection with the prosecutrix eight times in an hour. On objection being made to this remark the court stated to the jury that it would recall the testimony and not take counsel's statement on either side for what it was. The statement as to the number of acts of intercourse admitted by the defendants was correct, but the time within which they occurred does not appear to have been accurately stated. The matter of time was not of any great moment, and, in view of the caution given

by the court to the jury, the statement was harmless.   Commenting on the testimony of Edward Wensel the district attorney said: "There was a man that was the most disreputable, dirty pup of a liar that ever went on the witness stand.   He came to my office there and—"   At this point he was interrupted by the defendants' counsel objecting to what Mr. Wensel said to him in his office unless it is evidence.   No objection seems to have been taken to the statement that Wensel was a "liar" and a "pup," but objection was taken to the action of the district attorney in attempting to state what Wensel told him in his office.   It was entirely competent and proper for the district attorney to allude to that conversation, if he proposed to state it correctly, and we must assume that he did.   Wensel testified:

"I was subpœnaed in this case at the time of the preliminary examination.   In the district attorney's office at that time I said, in the presence of the district attorney and the sheriff, that I had never had connection with Anna Engelbretson in my life.   I said that I did not know Anna Engelbretson, had never heard any talk about her, and that, as far as I knew her, she was a decent, respectable girl."

In view of the testimony given by the witness on the trial, to the effect that he knew the prosecutrix and had had sexual intercourse with her before the occurrence of the alleged rape, it was proper for the district attorney to comment on this statement which he admitted making, for the purpose of impeaching his credibility.   We cannot approve of the language of the district attorney in characterizing the witness, even if he believed it to be true, but no exception was taken to that.

The district attorney also made the following statement: "And if that was your or my girl, you wouldn't have waited to have a trial in court."   And again: "The people of the country, from coast to coast, are watching this case, and when they have another case like this they will have a lynching

bee." In reference to the foregoing the court said to the jury:

"I think that statement of the district attorney is improper. You will decide this case according to the evidence which has been introduced here. If the evidence shows beyond a reasonable doubt that the offense of rape has been committed by any of these defendants as explained to you by the court, you will find them guilty; but if their guilt is not so established you will acquit them, and do so, of course, without regard to some other case or without regard to the future."

The remarks of the district attorney last quoted are subject to just animadversion and are reprehensible. The case was one well calculated to excite prejudice, and for this reason, if for no other, a reasonable degree of caution should be exercised in presenting the case to the jury. Considerable latitude must be allowed counsel in arguing cases, and it is only when this court is satisfied that the jury has not been sufficiently instructed by the court to disregard such remarks, or they appear to be so flagrant that they must have been prejudicial notwithstanding any admonition that may have been given by the court, that a judgment should be reversed because of them. Were it not for the admonition of the court in reference to the last statement made, it would have been reversible error under the decision in *Gutzman v. Clancy,* 114 Wis. 589, 597, 90 N. W. 1081, and cases there cited.

On the whole, we think the charge of the trial court, as well as his conduct of the trial, was eminently fair toward the defendants, and that no prejudicial error was committed.

*By the Court.*—Judgment affirmed.

Dodge, J., dissents.

A motion for a rehearing was denied March 9, 1909.