[File No. Cr. 127.]

STATE OF NORTH DAKOTA, Respondent, v. JAMES RUSSELL, R. J. Diemert, Hugh Grieve, Melvin Jarnson, Arvid Johnson, Adam McLaughlin, Carl Pilcher, Errol Peterson, A. G. Lattin, Austin Swalde, Roy Lattin, Leo Kakuschke, Hugh Hughes, Jack Eastman, William Cruden and Truman C. Peterson, Appellants.

(264 N. W. 532.)

Opinion filed December 7, 1935.   Rehearing denied January 27, 1936.

*Francis Heisler, Lee F. Brooks* and *Quentin N. Burdick,* for appellants.

274

*P. O. Salhre,* Attorney General, and *A. R. Bergesen,* State's Attorney, for respondent.

BURKE, Ch. J.   On the 13th day of February, 1935, the state's attorney of Cass county filed, in the county court of Cass county, an information charging the defendants, James Russell, R. J. Diermert, Hugh Grieve, Melvin Jarnson, Arvid Johnson, Adam McLaughlin, Carl Pilcher, Errol Peterson, A. G. Lattin, Austin Swalde, Roy Lattin, Leo Kakuschke, Hugh Hughes, Jack Eastman, William Cruden and Truman C. Peterson, with the crime of riot.   After a trial before a jury the said defendants were convicted and from the judgment of conviction and the order denying a new trial the defendants duly appeal.

At the outset respondent contends that the appeal is fatally defective on account of defects in the specifications of error.   The specifications are defective, but when aided by appellants' statement of facts and the argument, in the brief, we are able to determine, from the brief and the entire record, the questions which appellants intended to have reviewed in this court.   The statement of facts, in appellants' brief, is as follows:

"On January 27th, A. D. 1935, there was a strike in progress in Fargo, Cass County, North Dakota, which strike was called by Local 173, of the General Drivers' Union of the A. F. of L. against the employers of the Transfer Industry.   Two of the defendants, William Cruden and Austin Swalde were officers of the Local. . . . .

"On the day above set forth, a large number of persons, among them the defendants, but not the defendants Cruden, Swalde, Hughes and Eastman, repaired to the Red River where an Ice Harvesting Crew of the Moorhead Ice Company was engaged in cutting ice.   The persons, arriving in groups of varying numbers and at various times, approached different employes of the Ice Company who were engaged in the hauling operation from the place of cutting to the Storehouse. Later some of them, among them the defendants with the exception of the four named, i. e. Cruden, Swalde, Hughes and Eastman turned

towards the Ice Company employes working on the ice. Some persons —among them some of the defendants drew members of the ice crew in conversation, for the purpose of causing them to desist from further work. The conversation was conducted in a civil manner without the use of violence, without any threatening language and without the show of any weapons, arms, or clubs. During the conversation there occurred what was described some 'horse-play,' when one member of the harvesting crew was by someone present, pulled by the seat of his pants, off the platform, which platform was approximately one—two feet above the ice. The witness after being pulled off the platform, was put on the ice and let go without any word.

"Another witness testified that three of the persons present grabbed a needle-bar in the hands of the witness, and pushed the bar and with it the witness. No witness testified of being laid hand on, either by the defendants or by any other person, with the exception of the worker who was pulled off the platform by the seat of his pants.

"When the police and a great number of armed Special Deputies arrived at the river bank, there was neither a sign of violence, nor threat, nor any intimidation on the part of the defendants, nor on the part of any person present. . . .

"The police officers arrested a great number of persons present on the ice, among them some of the defendants found guilty herein. The persons arrested were herded into trucks and taken to the jail. On the same day after the arrests at the River, the police raided the Union Hall . . . approximately one mile from the scene of the alleged riot, and arrested a great number of persons there present, among them the defendants William Cruden, Austin Swalde, Hugh Hughes and A. G. Lattin and Jack Eastman. Two of the defendants Hugh Grieve and Adam McLaughlin were arrested on the Minnesota side of the Red River.

"While, before and during the arrest, none of the defendants displayed any weapons, three of the defendants after the arrest at or near the River gave to the arresting officers sticks, which they were carrying in their inside pocket.

". . . . the police returned to the Union Hall . . . took

possession of the tools and building, as well as office material, most of which was introduced as evidence on behalf of the state. . . ."

In argument in the brief and in the oral argument in this court it was stated "The principal issue involved in the instant case is, whether the State did or did not prove the offense with which it charged the Defendants; the main issue is, whether the State did or did not prove the Defendants guilty of the Offense of Riot beyond a reasonable doubt."

It is argued in the brief, and also in the oral argument, that these defendants went to the river as peaceful pickets to persuade the employees of the ice company to join their Union; that there was no act of violence, threat of violence or anything expressed or anything said which might be implied to express threat or violence; but appellants do not tell the whole story. They quote from the record testimony of witnesses on cross examination, for instance: one of the employees testified that they asked him to join them. There was no club of any kind; that no threat was made to him, no abusive names were called and that he was quite fair.

We have quoted at length appellants' statement of facts, which admits that all of the defendants, except Cruden, Swalde, Hughes and Eastman, were at the river at the time and place when and where the alleged riot occurred. The undisputed evidence shows that the defendant Eastman was also there at the same time and place and the state concedes that Cruden, Swalde and Hughes were not present.

Riot is defined by § 9807, Compiled Laws 1913, as "any use of force or violence, or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together and without authority of law. . . ." The undisputed evidence shows that there were from fifty to eighty men who approached the employees of the ice company where they were at work upon the ice, and if they (the strikers) or any of them used force or violence, or made any threat to use force or violence, and if such use of force or violence or such threat was accompanied by immediate power of execution, then all of the defendants, aiding, abetting or assisting, were guilty of riot.

The employees of the ice company were not asked to quit, they were

told to quit. Such language as this was used, namely: "This is your last load. Go home and don't come back." "We mean business. No fooling." "If you come back it will be just too bad for you." "You are nothing but a bunch of rats." "You better quit or we will make you." "You got to quit that is all." "Into the river with everything." What effect did this language have on the employees? John Sleeper testified: "I quit because I did not want to get into any trouble." They told Louis Frimanslund to "Go home, if you know what is good for you." He testified: "I didn't pay much attention to what else was said. I was paying attention to my own safety. I figured on putting the spike pole away and getting out of there." They told H. L. Nord "You are done for today," and Nord said: "All right." John Moland testified: "I stopped, sure, because I didn't want to get hurt." Then there are the weapons that were taken from some of the defendants, exhibit G, a piece of seasoned hard maple wood, an inch and a half square and two feet long, a handle whittled at one end; exhibit B, a piece of two inch maple flooring, about a foot and a half long; exhibit C, a piece of an ax handle, about two feet long; exhibit F, a three-fourths inch iron pipe, more than two feet in length. All the employees did quit, except Olson and Sleeper and they were immediately assaulted by the strikers and would probably have been injured except for the timely arrival of the police. There was also an assault upon a policeman. Clearly the undisputed evidence proved that there was force and violence used and language which amounted to threats accompanied by the immediate power of execution upon which evidence the jury might well find that all of the defendants participating in the trouble at the river were guilty of riot. The evidence fully sustains the verdict against all the defendants except Cruden, Swalde and Hughes.

Before trial, counsel for the appellants stated "We have at this time a preliminary motion to make. Upon investigation of several of the individual defendants and investigation of their peculiar cases, I find that the facts surrounding those cases in many instances differ from one another, and in furtherance of justice and good equity I believe at this time that it would be best and proper to try these defendants separately and at this time we move the Court for an order ordering these

trials separately, and each defendant have his day in court and have a separate trial." This motion was denied and appellants claim that such denial was error.

By Chapter 219, Session Laws of 1927, the law relating to separate trials for parties jointly accused was amended to read as follows: "Whenever two or more persons shall be jointly charged with any crime they shall be jointly tried, subject to the power of the court in its discretion, and for special reasons to order separate trials as to one or more of the defendants, and when tried jointly there may be joint or several convictions or acquittals, as the jury may determine the facts." This amended law specifically states, "Whenever two or more persons shall be jointly charged with any crime they shall be jointly tried, subject to the power of the court in its discretion, and for special reasons to order separate trials as to one or more of the defendants." In other words, they shall be jointly tried, unless there are special reasons for separate trials and when such special reasons are shown the court, in its discretion, may order separate trials. Otherwise they must be tried jointly. No reasons were shown and there was no error in denying separate trials. People v. Mullane, 256 Mich. 54, 239 N. W. 282; State v. Vincent, 202 Wis. 47, 231 N. W. 263.

Appellants contend that the cases cited do not apply, as the statutes of Michigan and Wisconsin require a showing to be made. The statute of Michigan, § 17298, reads as follows: "When two (2) or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court." Under this statute it is a matter wholly within the discretion of the court.

The Wisconsin case does not mention the statute. The court said in the case of State v. Vincent, supra: "It was just a bare motion, and, apparently, rather casually made. It is the settled rule in this jurisdiction that the granting of separate trials in such cases rests in the sound discretion of the trial court." Emery v. State, 101 Wis. 627, 78 N. W. 145.

The state admits that the defendants, Cruden, Swalde and Hughes, were not present at the scene of the alleged riot; but the state does claim that the said defendants were the leaders; that the said defend-

ants, Cruden and Swalde, were the president and secretary of the Union that called the strike; that they were active in conducting the affairs of the Union pertaining to the strike. They represented the said Union, spoke for and on behalf of the Union at meetings with the employers. The purpose of the meeting was to effect a settlement of the strike. At such meetings Cruden made demands and named terms and conditions upon which the strike could be settled. At the Interior Lumber Company's yard at Fargo on January 22, 1935, a carload of coal had been ordered by the St. John's Hospital from the Interior Lumber Company and when the truck was loaded with coal and about ready to pull out, a force of men, estimated in number from one hundred to a hundred and fifty, stopped the truck and forbade the delivery of the coal. The men picketing the place came out in front and said: "You can't move that truck. Don't you know the strike is on." A group of police officers arrived. Cruden was there. Officer Malcolm inquired as to who was in charge of the force holding up the truck and was referred to William Cruden. Cruden told Malcolm that the hospital would not take the coal unless it was delivered by a union driver. Malcolm then called the hospital and was informed that the hospital needed the coal regardless of who delivered it. When Officer Malcolm told this to Cruden, Cruden went to the hospital and told the Sister in charge that unless the coal was delivered by a union man there might be trouble. The Sister testified: "To my mind it was someone might be injured, there might be blood shed. I don't know his exact words. He was polite but at the same time demanding." The coal was delivered under police protection.

As further evidence, at about seven o'clock P. M. police officers and officers from the sheriff's office searched the Union headquarters and found a collection of clubs, sticks and lead pipes. Some of the weapons were rubber hose, with the ends plugged with hardwood and some with metal, an ax handle, pitch fork handle and practically everything in the big box, mentioned in appellants' statement of the case, was designed to be used as a club or weapon. When the officers made the search the weapons were scattered. Some were found on the floor, some on the bed and in various places. The evidence found in the headquarters was used only against the defendants, Cruden, Swalde and Hughes,

and we have examined this evidence very carefully for the purpose of determining whether it connects Cruden, Swalde and Hughes with the riot which took place on the 27th of January, 1935. The trouble over the load of coal at the Interior Lumber Company was on January 22, five days before the alleged riot.

It is clear from the evidence that Cruden was active in the crowd at the Interior Lumber Company office and that when the police arrived and took charge he went directly to the hospital and attempted to have deliveries of the coal refused unless it was delivered by a union man; but this evidence does not connect Cruden with the riot at the river on the 27th of January, five days later.

The testimony of Brenden is relied on to connect Cruden, Swalde and Hughes with the riot. He testified that he was a member of Local 173; that he was at Union Hall and went to the river where the trouble was. He said: "I went to Union Hall about 12 o'clock and heard someone talk about men working on the ice down at the Red River, but didn't know who he was. I should say that there were about thirty-five there at the time." Then he mentions a number of the defendants who were there, but doesn't mention Cruden, Swalde or Hughes. Somebody got up and talked to the crowd and he said there were men working on the river. Continuing the witness said: "Well, I wasn't up there when they started down. I was down in the National Cafe and met them on Front Street. I seen a couple walk down and they told me to walk along. When we got down there we were altogether. I caught up with the men down by Riverside Drive, by the ice house. We weren't in the same bunch, but close together." All this testimony shows is that Brenden went to Union Hall about 12 o'clock; someone said something about there being men at work down at the river; then someone made a speech and the men started to leave for the river. The inference from this testimony is that the information *that men were working on the river* and *the speech that was then made excited the men to action and caused them to rush to the river and engage in a riot.* But there is not a word in the testimony to prove that Cruden, Swalde and Hughes were present, or that they knew that men were working on the river, or that they heard the speech, which presumably caused the trouble. Witness Brenden named

defendants who were at the Union Hall at the time the information was given and the speech was made and does not name either Cruden, Swalde or Hughes.

Eli Weston testified that he knew Cruden and Swalde; they were officers in local union 173. It was stipulated that Cruden was President of Local 173 and Swalde was Secretary, and were such on the 27th of January, 1935. Witness continues: "I talked to Mr. Cruden January 23, 1935 at the Chamber of Commerce. It was a meeting of the local coal dealers and a committee from Local 173. Mr. Cruden and Mr. Swalde were both there. Mr. Cruden was spokesman for the committee and at that meeting there was discussed a settlement of the coal truck drivers' strike called January 22, 1935. I talked to Mr. Cruden concerning the strike. We discussed methods of settling the strike and I had certain propositions to offer. The coal dealers were there at the time and the various terms were discussed.

"Q. You may state whether or not Mr. Cruden or Mr. Swalde or either in the presence of the other stated that the strike would be called off if terms they offered would be met by the employers.

"A. That is correct."

All that this evidence proves is that there was a meeting of the coal dealers and the coal truck drivers in an attempt to settle a strike and that Mr. Cruden and Mr. Swalde were there present and Mr. Cruden was the spokesman for the strikers.

It is not illegal for the members of a labor union to go on a strike. It is not illegal for the strikers and the employers to meet for the purpose of settlement. Swalde was present at the meeting; but there is no evidence that he said or did anything. Cruden was the spokesman. He stated the terms upon which the strike could be settled, as he had a right to do. It was a lawful meeting, held for a lawful purpose, but this evidence is not sufficient to connect defendants Swalde and Cruden with the commission of the riot on the 27th of January, four days later.

It was proven that Exhibit L, a book found in the headquarters of the union, is in the handwriting of Swalde and it was introduced in evidence for the purpose of connecting him with the riot. Exhibit L is entitled:

"DAY BOOK
Local Chauffeurs, Teamsters & Helpers
Local Union No. 173
Fargo, N. Dak.
From 1933, Nov. 1, to 1934."

There is nothing in the book, exhibit L, except a list of the names of the members of the Union, the numbers of their applications and the dues paid to the Union.

The only evidence against Hughes is exhibit M, exhibits A and B, memorandums in the book exhibit M, which proves to be in his handwriting and was found in the headquarters of Local Union 173. It is a memorandum dated January 22, 1935. It starts "Strike began at 11:00 a. m. No violence very little action taken pending action." Then follows what occurred on the 23rd. The last paragraph of the memorandum minutes of the 23rd mentions Hughes name. It says "Sarles report evening 7:00 p. m. in Dri. Office. Present Hughes, Cruden, he had continued an attempt to get committees together but had failed to be able to do anything. They would agree to anything but union recognition." Then follows the proceedings on the 24th, 25th and the 26th, but there is nothing suggestive of a riot. On January 27th, the day of the alleged riot there is this memorandum:

"Jan. 27 1935

"Forenoon—quiet, very little doing. Nothing much to report. (Afternoon) had first demonstration at Independent Ice Co. Crew working on Ice 2:30 p. m. This is about an even break, they had the odds. Ice crew plus."

Exhibit A in the back of the book is a memorandum entitled "Prospective Bondsman." Then follows the names, presumably men who might act as bondsmen in case a bond, for any purpose, was necessary. Exhibit B, in the handwriting of Hughes, is also in the book, exhibit M, and is entitled "Who are the Scabs." There then follows a list of names. The record shows that the names were reported to the writer of the memorandum by others. There is no evidence that Hughes was a member of Local Union 173 and there is no evidence against him, except the exhibits, which are in his handwriting; a

memorandum of the events that had already happened and nothing to show that he did anything more than record the events in the book.

On page 23 of respondent's brief is the statement, viz.: "The State does not contend that Cruden, Swalde and Hughes were at the river. The State does contend that Cruden, Swalde and Hughes were the leaders and directors of the group of men who committed the riot at the river." This claim is based on the evidence showing that Cruden was president of the local organization that called the strike; that he was active in an attempt to prevent a delivery of a load of coal by the Interior Lumber Company on the 22nd of January; that he met with the employers in an attempt to settle the strike and that on the evening of the 27th weapons were found in the headquarters of the local union; that Swalde was secretary of the local union; that he was present at the meeting with the employers and exhibit L is in his handwriting and that exhibits M, A and B are in the handwriting of the defendant Hughes. The state does not claim that there is any evidence showing that the defendants, Cruden, Swalde and Hughes were active or did anything on the 27th, the date of the alleged riot. The record is silent on their activities on that date, except that apparently the memorandum, exhibit M, of what occurred in the afternoon of the 27th was made some time after the event at the river and before the search was made in union headquarters in the evening of the 27th.

The learned judge who tried the case, in his instructions to the jury, said: "There is no claim here that either Mr. Cruden, or Mr. Swalde, or Mr. Hughes were down there on the ice. In fact, I think it is conceded they were not present at this occasion on the river."

Exhibit M was introduced in evidence by stipulation. It states "Jan. 27th 1935. Forenoon—quiet, very little doing. Nothing much to report." From this statement there was no excitement in the forenoon, everything was quiet, nobody planning any riot or any trouble; but the memorandum continues: "(Afternoon) had first demonstration at Independent Ice Co. Crew working on Ice 2:30 p. m." Something happened between that first entry and 2:30 p. m. The witness Brenden testified and explains what happened. He said: "I went to Union Hall about 12 o'clock. Someone reported that men were work-

ing on the ice on the river then some man made a speech and the men who were present went to the river" and the riot was on.

There is a plain inference that the report that men were working on the river and the speech that followed that report excited the men and caused the riot; but there is no evidence showing the presence of Cruden, Swalde or Hughes at the hall when the speech was made, at the river at the time of the riot and no evidence, direct or circumstantial, connecting them, or either of them, in anyway, or showing that they had any knowledge of what took place at the hall or the river. Clearly the evidence does not sustain the conviction of Cruden, Swalde or Hughes.

The state's attorney, in offering exhibit L in evidence, stated that it was offered "for the sole and only purpose of showing what connection Austin Swalde had with the crime charged. . . ." To this offer there was an objection, counsel for the defendants stating that "Swalde had been connected by his jail statement, . . ." introduced as one of the exhibits.

"Mr. Bergesen: If counsel will admit Mr. Swalde's connection, and that Austin Swalde is as guilty as the rest of them—

"The Court: Don't make such statements as that.

"Mr. Bergesen: He said he needed no further connection. . . .

"Mr. Burdick: I want to make another motion for the record. I again move for a mistrial of this action. It seems we can't have a fair and impartial trial with statements . . . that these men are guilty before the jury here.

"The Court: I don't think the jury is going to be prejudiced by any statements of counsel. But I do advise the jury at this time that the statement just made was not a proper statement and the jury, of course will pay no attention to it. I think that is all that is necessary. . . .

"Mr. Bergesen: . . . I want to make myself clear. . . . I did not state that any one of the defendants were guilty. Counsel himself said that we had connected Swalde with the case and there was sufficient connection. . . . I said, if that is what he meant, he was as guilty as anyone might be, if anyone was guilty was the intention,

and when that statement was made there wasn't any intent that anyone was guilty until we have proved it first.

"Mr. Burdick: May I have a ruling on my motion for new trial?

"The Court: I have denied that motion. I will receive this exhibit only as it may relate to the defendant Swalde and for no other purpose."

This evidence was offered in an attempt to connect Swalde with the offense. It was so stated by the state's attorney and also by the trial judge. And after the explanation of the state's attorney and the timely admonition of the court there was no prejudice to any of the other defendants.

At the close of the testimony Mr. Burdick asked "for a ruling on our general objection as to the evidence referring to union activity, and to exhibits taken from the union hall, and to other evidence that doesn't refer directly to the alleged riot on the ice on the Red River." The jury was excused. Mr. Burdick presented his argument and after Mr. Bergeson had commenced his argument in reply it was discovered that there were two jurors in the court room. Counsel for the defendants moved for a mistrial, which was denied and appellants claim the denial of this motion was error. The statements of defendants' counsel, before his argument, were a request for a ruling on general objection to evidence referring to union activities and to the exhibits taken from Union Hall and to other evidence that doesn't refer directly to the riot on the Red River. That is, it was an objection to all the evidence introduced for the purpose of connecting Cruden, Swalde and Hughes and could not be prejudicial to the other defendants. There was no error in overruling the motion.

Appellants also specify that the court erred in its instructions to the jury. Objection is made to specifications of error relating to the instructions on the ground and for the reason that there were no exceptions to the instructions filed in the office of the clerk of court within twenty days after the instructions, that were given, were filed by the official stenographer with the clerk of court.

That part of § 10824, Compiled Laws 1913, requiring the filing of exceptions to the instructions, reads as follows: "But exceptions in writing to any of the instructions of the court *in any manner given,*

*or the refusal of the court to give instructions requested, may be filed by the defendant at his discretion,* with the clerk of the court within twenty days after the instructions are all filed as herein provided."

The blanket exceptions provided by the statute are to the entire charge. As a matter of course the court cannot be in error in all the instructions given and the supreme court, on appeal, ought not to be required to search the instructions for error; that is the business of the lawyer for the defense and that is the reason for the law requiring the filing of exceptions in writing to any of the instructions of the court in any manner given within twenty days after the filing of the instructions. That is, the exceptions in writing must be filed within the twenty days whether the instructions were given orally or in writing. The statute is clear and explicit in stating "in any manner given."

The court has construed this statute in State v. Reilly, 25 N. D. 339, 141 N. W. 720, and the case of State v. Shoars, 59 N. D. 67, 228 N. W. 413; State v. Youman, ante, 204, 263 N. W. 477. In both cases the instructions were oral and it is claimed, by the state, and it seems to be undisputed, that the instructions given were oral in the instant case. But whether the instructions were written or oral the exceptions must be filed within the twenty-day period or they are waived. Because of the importance of this case we have carefully gone over the exceptions and do not find any error. The most important exception and the one most relied on is specification twelve, namely: "The Court erred: In instructing the jury that intimidation was an element of the crime of riot with which the defendants stood charged."

The court read the statute defining riot and after defining force and violence he continues "The word threaten or threat, as it is used here, is a declaration of an intention or determination to injure another person by the commission of some unlawful act. An intimidation is the act of making another person timid and fearful by such a declaration. If the act intended to be done is not unlawful then the declaration is not a threat in the law and the effect thereof is not intimidation in the legal sense." This does not make intimidation an element of the crime of riot. It simply states that intimidation may be the effect

of a threat or a declaration of an intention to injure another person by the commission of some unlawful act.; After stating the issues the court said: "That is all there is to it, whether the contention on the part of the state that threats were made and violence committed, and intimidation of one kind and another made towards this ice crew, or fear put into the hearts of these men so they became frightened and afraid to remain there at work, or whether, as the defendants contend, that they simply went down there to try, by peaceful persuasion, to convince the men upon this ice crew to come to the assistance of the cause of the union, or the cause of Labor, in their dispute with their employers."

33 C. J. page 478 states that intimidation as relates to law has a definite meaning. "It signifies putting in fear; the act of making one timid or fearful, by a declaration of an intention or determination to injure another by the commission of some unlawful act; the use of violence or threats to influence the conduct or compel the consent of another." It was in this sense that it was used in the instructions. See, also, Green v. State, 109 Ga. 536, 35 S. E. 97. There was no error in the instructions.

The judgment is affirmed as to all the defendants except the defendants Cruden, Swalde and Hughes and as to the said Cruden, Swalde and Hughes a new trial is ordered.

BURR, NUESSLE, MORRIS and CHRISTIANSON, JJ., concur.